(No. 86194.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FELIPE HALL, Appellant.

*Opinion filed October 26, 2000.—Rehearing denied January 29, 2001.*

HEIPLE, J., specially concurring.
HARRISON, C.J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Lawrence Bapst, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and William R. Haine, State's Attorney, of Edwardsville (Joel D. Bertocchi, Solicitor General, and William L. Browers and David H. Iskowich, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Madison County, defendant, Felipe Hall, was convicted of two counts of first degree murder (720 ILCS 5/9—1(a)(1)

(West 1994)). The same jury found that defendant was eligible for the death penalty and that there were no mitigating factors sufficient to preclude the death penalty. Accordingly, the trial court sentenced defendant to death. Defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant's conviction and death sentence.

## BACKGROUND

### I. Trial Evidence

On October 4, 1994, Frank Crook, a farmer in rural Madison County, was awakened by the sound of two or three gunshots. Crook looked at his alarm clock; it was 1:30 a.m. The gunshots were followed by four shotgun blasts. Later that morning, David Mueller, a farmer whose property adjoins Crook's property, discovered two piles of clothing on a dirt field road, and observed in his field what appeared to be a body. Mueller contacted authorities. An officer from the Madison County sheriff's office who was dispatched to the scene found the nude bodies of two young women—a blond-haired Caucasian and an African-American. The women were later identified as Christina Masters and Samantha Beasley, respectively.

An autopsy of Masters revealed that she had suffered two shotgun wounds, one to the middle of the forehead, and one to the right breast. Either shot would have been fatal. Masters also suffered a traumatic amputation of the middle and ring fingers on her right hand, which the pathologist testified are defensive wounds. An autopsy of Beasley revealed that she, like Masters, suffered two shotgun wounds, one to the lower back and one to the right breast. In addition, Beasley suffered two gunshot wounds—a through-and-through wound in the left but-

tock and thigh, and the fatal wound, in which the bullet traveled through the right shoulder, into the lung and heart, ultimately entering the left arm. According to the pathologist, blood spatters on the soles of Beasley's feet indicate that she was not standing at the time she was shot.

Illinois State Police, who processed the crime scene, recovered two discharged Norinco brand 9-millimeter shell casings, a live 9-millimeter cartridge, and four discharged Remington brand shotgun shells. Police testified that the proximity of the shotgun shells is consistent with a single shooter, and that the barrel of the shotgun which was used in the murders was probably cut off.

Prosecution witnesses testified that on the evening of October 3, 1994, the victims, along with Tiffany Edwards and Ernestine Renee Rankins, went to Juanita Lane's apartment at the Colony North Apartments in Jennings, Missouri, a community outside St. Louis. Masters was driving a red Merkur Scorpio. At about 11:30 p.m., Masters drove Beasley, Lane and Edwards to Rally's, a local eatery, for hamburgers. A receipt from Rally's, which was recovered from the Merkur, shows a purchase on October 3 at 11:51 p.m. According to Lane, Masters was not her normal self that evening. Lane testified that Masters was quiet, nervous, and kept looking in her rearview mirror.

Upon their return to the Colony North Apartments from Rally's, Edwards and Lane went inside. Beasley and Masters stayed in the car, which Masters parked in the lot for the apartment complex. A short time later, Masters moved the Merkur to a different spot in the parking lot. According to a statement Edwards gave to police, the Merkur was parked just a few spaces away from a burgundy Oldsmobile Eighty Eight or Buick Park Avenue. Inside the burgundy car were three black males. Edwards later observed that the burgundy car was gone, and Masters' car was empty.

Various prosecution witnesses testified regarding incidents involving the Merkur, Masters, and defendant just prior to the murders. David Fiedler, a loan officer at General Finance, identified defendant as the man who was with Masters on September 26, 1994, when Masters applied for an auto loan in connection with the purchase of the Merkur. Fiedler remembered the transaction because the Merkur Scorpio is an unusual car. Fiedler described defendant as "controlling." A week after the purchase, Fiedler received a telephone call from defendant, who identified himself as "Jonathan." Defendant indicated that he would like to resell the Merkur.

Kimberly Woolridge testified that she met defendant through a friend, Michelle Smith, in the summer of 1993, and knew defendant under various names, including Felipe Hall, Lamont Hall, and Jonathan Scales. At defendant's request, Woolridge verified employment for Masters in connection with the auto loan, although Woolridge's company did not, in fact, employ Masters. Woolridge further testified that one evening, as she, Smith and defendant were leaving A.J.'s, a restaurant and lounge in St. Louis, defendant discovered that his car, the Merkur, was gone. Defendant was extremely upset.

Defendant's cousin, Damie Brown, also testified regarding an incident outside A.J.'s in which defendant's car, the Merkur, was missing. According to Brown, as they drove around looking for the vehicle, Masters drove up in her station wagon, told defendant that the Merkur was stolen, but that she knew where to find it. They followed Masters to the Colony North Apartments, where the Merkur was parked. Defendant told Brown that it was funny how the car kept disappearing.

Juanita Lane testified that three or four days prior to the shootings, Masters asked Lane to accompany her to pick up her new car. The two women drove to a Motel 6 in the St. Louis area where the Merkur was parked. Rec-

ords from the Motel 6 establish that Masters rented a room in her name on September 25, 1994, which was paid through October 3, 1994. Motel employees identified defendant as the man seen in that room on a regular basis. Lane also testified that on the day following their trip to the Motel 6, Masters again asked Lane to accompany her to pick up the Merkur, which Lane did. This time the vehicle was parked outside A.J.'s.

Andre Franklin, who at the time of trial was serving a sentence at the Colorado State Penitentiary, testified that defendant told him the Merkur was his car, but that it was registered in the name of some female who was "tripping a little bit." Franklin explained to investigators that "tripping" meant that the woman was "fucking with [the car]." According to Franklin, defendant did not appear unhappy or emotional when defendant talked to him about the Merkur.

Michelle Smith testified that she knew defendant through Brown, with whom Smith had grown up. On the evening of October 3, 1994, Smith rented a green Chevy Aerostar van for defendant. Defendant explained that he was moving and would need the van for a day. Smith picked up defendant at the Motel 6 and went to the car rental agency. Smith recalled that defendant was wearing construction boots.

Smith and defendant met the next day, October 4, at approximately 5 p.m. to return the van. With defendant were "Dre" and "Rico." Smith testified that defendant seemed frustrated, "hyper," and rushed. As Smith settled the paperwork, she saw defendant wiping down the door and the interior of the van. When Rico asked defendant what he was doing, defendant responded, "[E]vidence, fingerprints." Smith noticed that defendant's upper lip was cut all the way through. Defendant said he had been lifting weights and was hurt while spotting for someone. Defendant reimbursed Smith for the cost of the rental van.

Defendant asked Smith to rent him another vehicle to go to Colorado, but Smith refused. Defendant told Smith he needed to move again because the motel room was in Masters' name. When Smith inquired further, defendant told her to watch the news and that Masters "was not living." Smith watched the news, saw Masters' photograph and thought that she was someone Woolridge had met. Smith called Woolridge, who confirmed that Masters was the girl for whom Woolridge had verified employment.

Sherry Harris testified that at 10:30 or 11 p.m. on October 3, 1994, she left her sister's house in St. Louis and was going to take a bus to her boyfriend's house in Jennings. As she walked to the bus stop, a green van pulled up. The driver of the van, whom Harris identified as defendant, offered her a ride. Harris accepted. Defendant introduced himself as Lamont. They proceeded first to Allen Street in St. Louis, where defendant had a brief conversation with a male. In this conversation, defendant said he would be back to pick him up that night. Defendant and Harris then proceeded to the Colony North Apartments in Jennings to see if defendant's car was there. Defendant explained that the prior evening his girlfriend had stolen a set of extra car keys and that she had later stolen his vehicle.

When Harris and defendant arrived at the Colony North Apartments, Harris saw a red car, which she identified in court from a photograph of the Merkur. Harris saw the back of the heads of the two occupants of the vehicle. The female driver was blonde and light-skinned; the female passenger was dark-skinned. Defendant parked close to the Merkur and said, "[S]he got a nigger in my shit." Defendant was angry. Defendant then exited the van, removed a two- to three-foot-long shotgun from under the seat, and went over to the Merkur. Defendant pointed the shotgun at the driver and said, "[Y]ou got to

three to get out." At this point, Harris exited the van and ran to her boyfriend's house, which was not far away.

The following evening, October 4, 1994, defendant went to the airport and purchased two tickets to Denver in the names of Rico Hall and Tracy Clay. The ticket agent testified that defendant, who was with two other men, did most of the talking. Although defendant indicated that he wanted to fly out that evening, the last flight to Denver had already departed. The ticket agent described defendant as smooth, polite, educated, and "kind of a con[-man]." According to testimony from Andre Franklin, the two tickets were for defendant and himself, who flew out the next morning as scheduled. Franklin also testified that he and defendant had discussed going to Colorado on numerous occasions. On October 3, 1994, between 11 p.m. and midnight, defendant found Franklin on Allen Street in St. Louis. Defendant was driving a van. With defendant was an African-American female. Defendant told Franklin that he was leaving for Colorado that evening, that Franklin should get his things together, and that defendant would pick him up after he dropped off his passenger. Franklin estimated that defendant would be back within an hour. Franklin, however, did not see defendant again until late the following morning.

Based on information received from Kimberly Woolridge, Madison County sheriffs learned that defendant maintained a storage locker at a facility in St. Louis. The rental agreement for the locker, dated August 26, 1994, was in the name of Suzanne Eckler, defendant's wife. In a search of the locker, sheriffs seized a Jennings 9-millimeter semiautomatic pistol, three 9-millimeter clips, a box of 9-millimeter shells and one Remington brand shotgun shell. The 9-millimeter ammunition was of a different brand than the 9-millimeter shell casings found at the crime scene. Sheriffs also seized a type of

arrow gun which resembles a shotgun. Harris, however, testified that the arrow gun was not the weapon she saw defendant take from the van on the night of October 3.

A forensic examination of the pistol seized from the storage locker disclosed that while it was not the weapon involved in the murder of Beasley, it was its "twin." St. Louis police recovered the other twin weapon in November 1994. Police officer David Dietzel testified that they were monitoring an area of known gang activity and illuminated their lights on a large group of people. An individual later identified as Monaco McNeil dropped a gun. McNeil denied the gun was his, but provided no information on how he obtained it. Forensic tests established that the gun McNeil dropped was the one used in Beasley's murder.

Suzanne Eckler, defendant's wife, testified that in the summer of 1994, at defendant's request, she purchased two brand new guns for him. Eckler purchased the weapons in Colorado where she was living, and mailed them to defendant in St. Louis under a different name. Eckler identified the handgun seized from the storage locker and the weapon recovered from McNeil as the two guns that she purchased for defendant. Eckler also identified a receipt that was made out in her name, dated July 16, 1994, in connection with her purchase of the second gun.

A housekeeper at the Mary Kay Inn in Hazlewood, Missouri, where defendant stayed for approximately six to eight weeks during the summer of 1994, told police that sometime in August she saw two similar black handguns in defendant's possession.

Tammy Brown, who was also employed as a housekeeper at the Mary Kay Inn, testified that in mid-summer 1994, she developed a relationship with defendant. Brown recalled seeing a handgun and a shotgun in his room. According to the statement she gave to police, Brown saw

what looked like a sawed-off shotgun, approximately two feet long, which defendant said he was holding for somebody. At trial, Brown's testimony was equivocal as to whether the shotgun she saw could have been the arrow gun found in defendant's storage locker. Brown testified that she still had feelings for defendant, who had helped her financially.

Brown further testified that on one occasion, as she was leaving defendant's motel room, she saw a young, blond-haired girl entering his room. When Brown asked defendant about the girl, defendant said that she was just somebody he needed to help him rent cars and hotel rooms and get identification for him.

Dawn Meyers also saw a handgun on the nightstand in a St. Louis hotel room occupied by defendant during the summer of 1994, as well as a shotgun. Meyers had gone to defendant's hotel room to pick up a friend, Tammy Witt, who was dating defendant. Meyers testified that she was "positive" that the arrow gun seized from defendant's storage locker was not the shotgun she saw in defendant's room. Witt, however, testified that the only gun she saw was a black handgun.

Glen Shubert, a forensic scientist with the Illinois State Police, compared hair samples taken from the victims with hair found in the Aerostar van driven by defendant. Of the several Caucasian and Negroid hairs found in the van, one Caucasian hair was microscopically similar to Masters' head hair, and one Negroid hair fragment was microscopically consistent with Beasley's head hair.

Thomas Gamboe of the Madison County sheriff's department testified that tire tracks at the crime scene did not match the tires on the Aerostar van, but were similar to the tire treads on one of the police vehicles. Although investigators found a footwear impression at the crime scene, they were unable to find a match. Eck-

ler testified that when defendant returned to Colorado in October 1994, he purchased a new pair of steel-toed hiking boots. Defendant told Eckler that he threw his other boots into a dumpster because he thought a print could be matched to those boots.

Defendant testified on his own behalf. Defendant admitted to multiple felony convictions in Colorado. He denied killing Beasley and Masters. Defendant testified that he obtained two handguns, but that he sold one of them in the summer of 1994 because he needed money. Defendant also testified that he never fought with Masters over the Merkur.

Although defendant initially testified that the arrow gun was not in the van on October 3, 1994, defendant later testified that this was the gun he held as he approached the Merkur in the parking lot of the Colony North Apartments. Defendant did not recall telling Masters and Beasley that they had to the count of three to exit the car. Rather, he said the gist of his conversation with Masters was that he wanted the car back and that they agreed to meet at the motel.

Defendant explained that he wiped down the steering wheel and the driver's side door of the van that Smith had rented for him in order to remove the blood from a cut lip which had dripped on the van. Defendant remembered buying new boots in Colorado, but denied telling his wife that he got rid of the other pair because of a possible footprint match. Finally, defendant testified that on October 4, 1994, at 1:30 a.m., he placed a telephone call to his mother to let her know he was alright.

Eliza Madison, defendant's mother, testified consistently about the October 4 telephone call. She also said defendant sounded calm and normal.

William Hoffman, Masters' stepfather, testified that on the evening of October 4, 1994, he answered a telephone call at his mother-in-law's house from a man

who identified himself as Lamont. The caller asked for Masters.

Tequila Green, Beasley's cousin, testified that she could have told Madison County sheriffs that Beasley was dating a black man named Reggie, and that she had seen Reggie drop off Beasley in a dark Oldsmobile Eighty Eight. Green, however, did not recall providing that information to authorities. Daarino Musoddiq also testified that she may have told Madison County sheriffs that Beasley had dated Reggie and that she had seen Reggie drop off Beasley in an older model vehicle, possibly an Oldsmobile Cutlass or Eighty Eight.

In rebuttal, Detective Leonard Suhre, of the Madison County sheriff's department, testified that the department's investigation revealed that "Reggie" was Reginald Stewart. According to Suhre, on the night of October 3, 1994, Stewart was in the St. Clair County jail.

The jury found that defendant was guilty of the murders of Beasley and Masters.

## II. Sentencing Hearing

At the first phase of the capital sentencing hearing, the same jury found that defendant was eligible for the death penalty in that he was convicted of murdering two or more persons (720 ILCS 5/9—1(b)(3) (West 1994)), and that the murders were committed in a "cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means" (720 ILCS 5/9—1(b)(11) (West 1994)).

At the second phase of the capital sentencing hearing, the State presented evidence in aggravation that defendant was involved in the drug trade; that defendant had made threats to Masters and others; and that defendant had an extensive criminal record, with a history of assaults. The State also supplemented the record with victim impact statements from four family members, as

well as the testimony of one family member. In mitigation, defendant presented the testimony of his mother concerning his potential for rehabilitation and her belief in his innocence.

The jury found that there were no mitigating factors sufficient to preclude a sentence of death. Accordingly, the court sentenced defendant to death.

## ANALYSIS

### I. Speedy-Trial Issue

Prior to trial, defendant filed a motion to dismiss, alleging a violation of his right to a speedy trial. See 725 ILCS 5/103—5(a) (West 1994). Defendant argues that the trial court erred in dismissing his motion without an evidentiary hearing.

An accused possesses both statutory and constitutional rights to a speedy trial. 725 ILCS 5/103—5(a) (West 1994); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Although the statutory and constitutional provisions address similar concerns, the rights established by each are not necessarily coextensive. *People v. Kliner*, 185 Ill. 2d 81, 114 (1998); *People v. Jones*, 104 Ill. 2d 268, 286 (1984). Defendant here asserts only a violation of his statutory right to a speedy trial.

Under the speedy-trial statute, a defendant in custody for an alleged offense must be tried within 120 days from the date he or she was taken into custody, "unless delay is occasioned by the defendant." 725 ILCS 5/103—5(a) (West 1994); *People v. Bowman*, 138 Ill. 2d 131, 137 (1990). Similarly, a defendant on bail or recognizance must be tried within 160 days from the date the defendant demands trial "unless delay is occasioned by the defendant." 725 ILCS 5/103—5(b) (West 1994).

A delay is "occasioned by the defendant" when the defendant's acts caused or contributed to a delay resulting in the postponement of trial. *Kliner*, 185 Ill. 2d at

114; *People v. McDonald*, 168 Ill. 2d 420, 438 (1995). Any period of delay found to be occasioned by the defendant tolls the applicable statutory period. 725 ILCS 5/103—5(f) (West 1994); *McDonald*, 168 Ill. 2d at 438-39. A defendant not tried within the statutory period must be released from custody and is entitled to have the charges dismissed. 725 ILCS 5/103—5(d), 114—1(a)(1) (West 1994); *Kliner*, 185 Ill. 2d at 114-15. The defendant bears the burden of establishing facts which demonstrate a violation of the speedy-trial statute. *Kliner*, 185 Ill. 2d at 114. Only where a defendant's speedy-trial motion, and any answer filed by the State, present an issue of fact not of record must a trial court conduct a hearing on the defendant's motion. 725 ILCS 5/114—1(c), (d) (West 1994). On review, a trial court's determination as to whether a delay is attributable to the defendant is entitled to much deference and should be sustained absent a clear showing that the trial court abused its discretion. *Kliner*, 185 Ill. 2d at 115; *McDonald*, 168 Ill. 2d at 438; *Bowman*, 138 Ill. 2d at 137.

In the present case, the trial court permitted argument on defendant's speedy-trial motion, but did not set the matter for an evidentiary hearing. The court determined that, based on its review of the record and Illinois law, only 98 days under the speedy-trial statute had elapsed and, therefore, that no violation of defendant's statutory speedy-trial right occurred. Defendant argues that the trial court should not have ruled on his motion without first conducting a hearing to determine the truthfulness of defendant's allegation that his appointed counsel failed to consult with him prior to requesting several continuances. Defendant maintains that the trial court improperly attributed delay to him on the basis of a "silent record."

We agree with defendant that where the record is silent, a delay in trial will not be presumed to be attrib-

utable to a defendant. See *People v. Reimolds*, 92 Ill. 2d 101, 106 (1982). Here, however, the record is not silent. To the contrary, the record discloses that several continuances were requested "upon [m]otion of [d]efendant." In each instance, the order granting the continuance states that the delay "is ruled attributable to the [d]efendant." Each order is acknowledged by defense counsel.

Generally, for purposes of tolling the speedy-trial period, a defendant is charged with delay caused by defense motions. *People v. Ladd*, 185 Ill. 2d 602, 608 (1999). Further, this court has held that where a defense attorney requests a continuance on behalf of a defendant, the resulting delay is attributable to the defendant. See *Bowman*, 138 Ill. 2d at 141-42. This result naturally flows from the law governing attorney-client relations. As we explained in the *Bowman* case:

> "The general rule in Illinois is that a client is bound by the acts or omissions of his lawyer-agent. While not an ironclad rule, it is necessary in order for a representative system of litigation to function. [Citation.] In criminal proceedings, an attorney is authorized to act for his client and determine for him procedural matters and decisions involving trial strategy and tactics. [Citations.] Thus, the affirmative acts of a defendant's counsel cannot be separated from the defendant's own acts." *Bowman*, 138 Ill. 2d at 141.

The record need not affirmatively show that, in conjunction with a request for a continuance, the attorney has consulted with the defendant. Such a rule would "intolerably burden" the trial courts. *Bowman*, 138 Ill. 2d at 142. Moreover, "an ordinary, uncontested motion for a continuance does not involve rights of the accused of such a substantial nature as to invalidate the actions that occur without the accused's express consent." *Bowman*, 138 Ill. 2d at 142. Thus, defendant cannot claim that the delay in trial should not have been attributed to him.

Finally, where a defendant does not promptly repudiate an attorney's unauthorized act upon receiving knowl-

edge of the same, the defendant effectively ratifies the act. *Bowman*, 138 Ill. 2d at 143. A contrary rule "would force every trial court to inquire into every chargeable delay to determine whether an accused personally agreed to a continuance, or at least whether the accused waived his right to appear at the hearing." *Bowman*, 138 Ill. 2d at 144.

Defendant did not allege in his motion to dismiss that he had made any attempt to repudiate the allegedly unauthorized acts of appointed counsel in seeking several continuances. Even after defendant retained private counsel, defendant did not file his motion to dismiss based on the speedy-trial statute for over five months. Thus, defendant effectively ratified the acts of appointed counsel.

Because defendant's speedy-trial motion did not present an issue of fact outside the record material to the court's disposition of the motion, we hold that the trial court did not err in dismissing the motion without an evidentiary hearing. See 725 ILCS 5/114—1(d) (West 1994).

## II. Trial Issues

### Sufficiency of the Evidence

Defendant argues that the State failed to prove him guilty beyond a reasonable doubt. Defendant maintains that the State's case consisted of weak, circumstantial evidence, *i.e.*, that no physical evidence established that he was at the crime scene; that the gun used to murder Beasley was found in the possession of another man, who was not charged with a crime; that the forensic hair evidence did not establish that the victims were in the van used by defendant; that the evidence of motive was conflicting; and that there was evidence that someone other than defendant could have committed the murders.

When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not

the function of this court to retry the defendant. *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997). Rather, the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Young*, 128 Ill. 2d 1, 49 (1989). Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *People v. Brown*, 185 Ill. 2d 229, 247 (1998); *McDonald*, 168 Ill. 2d at 444.

Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *McDonald*, 168 Ill. 2d at 444; *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996). The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *People v. Jones*, 105 Ill. 2d 342, 350 (1985).

Based on our examination of the evidence in light of the foregoing principles, we conclude that a rational trier of fact could have found defendant guilty of the first degree murders of Masters and Beasley beyond a reasonable doubt. There was credible evidence that the 9-millimeter handgun, which delivered the fatal shot to Beasley, was purchased by defendant's wife and delivered to defendant in St. Louis shortly before the murders. Although defendant testified that he sold the gun prior to the murders, the jury was free to disregard such testimony as not credible. Further, the fact that Monaco McNeil, from whom the gun was eventually recovered, was not charged with a crime does not diminish the fact that one of the murder weapons was traced directly to defendant.

In addition, Sherry Harris unequivocally testified that on the evening of October 3, 1994, defendant, upon seeing the Merkur in the parking lot of the Colony North Apartments, took a shotgun from the van in which they were riding, pointed it at the light-skinned driver of the Merkur, and angrily ordered the two women out of the vehicle. These events occurred within two hours of the murders. Significantly, Harris is a neutral third party. She met defendant once and has no relationship with the other witnesses or the victims. Harris' testimony is also consistent with the other prosecution witnesses who testified that they had seen a shotgun in defendant's possession during the months immediately prior to the murders.

Furthermore, there exists credible evidence that defendant made inculpatory statements shortly after the murders. At the car rental agency, defendant explained that he was wiping down the rental van because of "evidence, fingerprints." Defendant also told Michelle Smith that Masters was dead, and that he needed to move because the motel room was registered in Masters' name.

Defendant argues that the evidence of motive was conflicting. The State presented evidence that defendant was a controlling person, that he regarded Masters as merely someone he needed to help him rent cars and hotel rooms, and that the Merkur became the object of a tug-of-war between defendant and Masters. To the extent there exists a conflict in the evidence as to defendant's reaction to Masters' use of the Merkur, such a conflict is for the trier of fact to resolve. See *Digiloramo*, 179 Ill. 2d at 46; *McDonald*, 168 Ill. 2d at 448-49.

Defendant also challenges the State's forensic hair evidence, arguing that such evidence does not establish that the victims were ever in the rental van. Defendant cites to testimony from the State's forensic scientist that the hairs recovered from the van could have been in-

nocently transferred, and that no DNA testing was performed on the Caucasian hair, although certain DNA testing was available in 1994. Defendant also argues that no witness was able to testify conclusively that the hairs recovered from the van matched the hair samples taken from Masters and Beasley. Any infirmities in the testimony of the State's expert witness merely go to the weight of the evidence and the expert's credibility as a witness. These determinations were for the jury, as the finder of fact, to make. See *McDonald*, 168 Ill. 2d at 448-49; *Young*, 128 Ill. 2d at 51.

Defendant further argues that there was evidence that someone other than defendant could have committed the murders. Defendant relies upon testimony that a burgundy vehicle with three black males was observed in the parking lot of the Colony North Apartments, just a few spaces away from where the Merkur was parked, and that Masters was seen with a large amount of cash. Defendant's theory is that after he confronted Masters and Beasley in the parking lot, the three men in the burgundy car accosted the women, and then abducted and murdered the women, perhaps for the money, coincidentally using the very handgun which defendant's wife purchased for defendant and sent to him in St. Louis.

Where circumstantial evidence relied upon to support the defense that someone other than the defendant committed the crime is unsatisfactory, based upon mere surmise or possibility, a hypothesis of innocence may be rejected by the trier of fact. *People v. Coleman*, 168 Ill. 2d 509, 533 (1995). We conclude that such is the case here, and that the jury could properly reject defendant's theory of innocence. Moreover, the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *McDonald*, 168 Ill. 2d at 447.

Finally, defendant argues that reversal of defendant's conviction is warranted under *People v. Smith*, 185 Ill. 2d 532 (1999). We disagree. In *Smith*, the victim was shot and killed outside a bar by a gunman wearing dark clothing. This court reversed the defendant's murder conviction where the testimony of the State's key witness, the only witness who identified the defendant as the gunman, was repeatedly impeached and contained serious inconsistencies with the testimony of other witnesses. The record in *Smith* also indicated that the State's key witness had a motive to falsely implicate the defendant. Further, the only circumstantial evidence of the defendant's involvement in the crime was his presence in the bar and the dark clothing that he wore. We concluded that the evidence merely narrowed the class of individuals who may have killed the victim, but that it did not point specifically to the defendant, as there were two other men with the defendant on the night of the shooting, both of whom also wore dark clothing.

In contrast to the *Smith* case, the testimony of the State's key witness in this case, Sherry Harris, stands unimpeached and is consistent with the testimony of other witnesses as to defendant's possession of a shotgun. There is nothing in the record suggesting a reason for Harris to implicate defendant falsely. As noted earlier, Harris has no relationship with defendant, with the victims, or with the other witnesses. Further, unlike the *Smith* case, the circumstantial evidence in this case, *i.e.*, defendant's angry confrontation with the victims, his possession of one of the murder weapons, and his inculpatory statements, points specifically to defendant.

We conclude that the evidence is not so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt.

### Marital Privilege

Defendant next argues that the admission of certain

testimony by Suzanne Eckler, defendant's wife, constitutes reversible error.

On direct examination of Eckler, the prosecutor elicited testimony concerning four conversations Eckler had with defendant. With respect to the first two conversations, Eckler testified that during the summer of 1994, defendant asked her on two occasions to purchase a gun for him. According to Eckler, defendant told her what kind of gun to buy, that she should send the guns to him in St. Louis via Federal Express so that the package is not scanned, and that she should use a fictitious name on the package.

With respect to the third conversation, Eckler testified that defendant told her to advise the storage rental company that the rental payment would be sent and that no one should enter the storage locker.

As to the fourth conversation, Eckler initially testified that she found it unusual that defendant purchased hiking boots when he returned to Denver in October 1994 because she had just bought him a similar pair. Eckler further testified that defendant told her that he thought a print could be matched to his boot, so he purchased a new pair and threw the first pair of boots into a Dumpster.

Defendant argues that the introduction of the foregoing testimony was in violation of the marital privilege applicable to criminal proceedings. See 725 ILCS 125/6 (West 1994). The marital privilege provides that, in criminal cases, husband and wife may testify for or against each other, but may not testify as to "any communication or admission made by either of them to the other or as to any conversation between them during marriage." 725 ILCS 125/6 (West 1994).

The statute creates a privilege which may be waived by the holder of the privilege, in this case, the husband. We agree with the State that defendant's failure to invoke

the privilege during his wife's testimony waived the privilege. See *People v. Orange*, 121 Ill. 2d 364, 384 (1988); *People v. Sanders*, 99 Ill. 2d 262, 272 (1983). Moreover, defendant's failure to object at trial and to raise this issue in his post-trial motion has resulted in waiver of this issue on appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Defendant, however, argues that the admission of Eckler's testimony amounts to plain error. Under the plain error rule, issues not properly preserved may be considered by a reviewing court under two limited circumstances: (1) where the evidence is closely balanced, so as to preclude argument that an innocent person was wrongfully convicted; or (2) where the alleged error is so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process. 134 Ill. 2d R. 615(a); *People v. Nielson*, 187 Ill. 2d 271, 297 (1999); *People v. Macri*, 185 Ill. 2d 1, 58 (1998). Neither circumstance is present here.

The marital privilege applies only to *communications* and *admissions* made by either spouse to the other, and to *conversations* between spouses during marriage. 725 ILCS 125/6 (West 1994). Eckler's testimony, therefore, describing *her own conduct* in purchasing the guns and sending them to defendant was not subject to the privilege. Accordingly, even if defendant had invoked the privilege and Eckler's testimony as to defendant's instructions to her concerning the gun purchases had been excluded, there still would have been substantial evidence establishing defendant's possession of one of the murder weapons. We thus conclude that any error in the admission of Eckler's testimony as to the first two conversations with defendant is not so substantial as to deny defendant a fair trial.

We reach the same conclusion as to the third conver-

sation. Eckler's testimony implied that defendant had control over the storage locker. However, the jury could draw the same inference from the testimony of Kimberly Woolridge and defendant. Woolridge testified that she accompanied defendant to the storage locker facility on one occasion. Defendant testified that he kept the code for the storage locker and that his wife used the locker only a couple of times to put his gear and belongings into the locker.

Eckler's testimony relating the fourth conversation with defendant revealed his concern about a possible bootprint match. Unlike the first two conversations, Eckler's testimony does not relate to her own conduct. In addition, unlike the third conversation, the same inference cannot be drawn from other testimony. Nonetheless, we do not find plain error.

The marital privilege does not result from a policy of safeguarding the quality of evidence presented at trial as does, for example, the bar against the admission of polygraph evidence. Indeed, evidence withheld under the marital privilege is relevant and often highly reliable. Rather, the marital privilege stems from a policy of promoting family harmony. *Sanders*, 99 Ill. 2d at 270, 273-74. In light of the policy underlying the marital privilege, the admission of Eckler's testimony does not call into question the fundamental fairness of defendant's trial.

In addition, as already discussed, the State presented a strong circumstantial case. There was eyewitness testimony by an impartial third person that less than two hours prior to the victims' murders, defendant, armed with a shotgun, ordered the victims out of their vehicle. Defendant does not deny that he was present in the parking lot at that time. There was testimony as to inculpatory statements defendant made at the car rental agency regarding his desire to rid the rental van, which

he was driving on the evening of the murders, of evidence and fingerprints. Defendant admitted that he wiped down the van. There was evidence establishing defendant's possession of one of the murder weapons—a fact, as noted above, that would not have been altered had defendant's conversations with Eckler on this subject been excluded. There was also evidence detailing defendant's relationship with Masters, as well as the events surrounding the purchase and use of the Merkur. The State further presented evidence refuting defendant's theory that an acquaintance of Beasley was involved in the victims' murders. The evidence, therefore, was not closely balanced.

In the alternative, defendant argues that trial counsel's failure to object to Eckler's testimony constitutes ineffective assistance. Claims of ineffective assistance of trial counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). First, a defendant must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Second, a defendant must show prejudice by demonstrating that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Evans*, 186 Ill. 2d 83, 93 (1999). A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue

of counsel's alleged deficient performance. See *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Evans*, 186 Ill. 2d at 94.

Defendant here has failed to establish the requisite prejudice. As discussed above, the exclusion of Eckler's testimony regarding the first two conversations would not have diminished in any appreciable way the evidence establishing defendant's possession of one of the murder weapons. Also as discussed above, the admission of Eckler's testimony as to the third conversation concerning the storage locker was inconsequential in light of other testimony from which the same inference could be drawn. As to the fourth conversation, we find that there is no reasonable probability that the outcome of the trial would have been different had this testimony been excluded. Without evidence that defendant was concerned about a bootprint match, there was still compelling circumstantial evidence of defendant's guilt. Accordingly, we reject defendant's claim of ineffective assistance of trial counsel.

## Evidence of Spousal Abuse

Defendant argues that testimony of spousal abuse, elicited by the prosecutor on direct examination of defendant's wife, denied defendant a fair trial.

Suzanne Eckler, defendant's wife, testified that when defendant returned to Colorado, she stayed with him for approximately 2½ weeks at a Denver hotel. During the second week, defendant physically abused her. At the time, Eckler was pregnant with defendant's child. Eckler testified that "it started out with a little push here, a little push there. By the time I got home, I had a fat lip, big old bump on my head. I had a concussion. *** [H]e stepped on my face. Thrown [sic] things at me." Eckler also testified about an incident in which, during an argument between them, defendant threw a footstool at the wall, choked her, and threatened her. Eckler said she was "scared to death."

Generally, evidence of other crimes is inadmissible if relevant only to establish the defendant's propensity to commit crime. *Kliner*, 185 Ill. 2d at 146; *People v. Placek*, 184 Ill. 2d 370, 385 (1998). Such other-crimes evidence is objectionable because it carries the risk that a jury will convict a defendant merely because it believes the defendant is a bad person who deserves punishment. *Placek*, 184 Ill. 2d at 385. Although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different. If it is unlikely that the error influenced the jury, reversal is not warranted. *People v. Cortes*, 181 Ill. 2d 249, 285 (1998).

Defendant did not object at trial to the testimony regarding spousal abuse, and defendant did not raise the issue in his post-trial motion. Accordingly, any error is waived. See *Enoch*, 122 Ill. 2d at 186. Defendant, however, argues that defense counsel's failure to object was a fundamental error and, given the closeness of the evidence, constitutes plain error. Defendant further argues that counsel's failure to object denied him the effective assistance of trial counsel.

We agree with defendant that the admission of Eckler's testimony regarding incidents of abuse was not proper, and note that the State offers no ground justifying the admission of this testimony. There was, however, no plain error. As we already discussed, the evidence of defendant's guilt was not closely balanced. In addition, we hold that the asserted error is not of such magnitude as to have denied defendant a fair trial.

Defendant argues that the other-crimes evidence was similar in character to the allegations contained in the offenses for which defendant was on trial. We do not agree. Defendant was not on trial for abusing his spouse. He was on trial for first degree murder. That the victims

happened to be women does not persuade us that the jury was unduly influenced by Eckler's testimony of spousal abuse. In light of the State's strong case against defendant, this evidence was simply not a material factor in defendant's conviction.

We note that on cross-examination, defense counsel challenged Eckler's credibility as to the claimed incidents of abuse. Defense counsel also challenged Eckler's overall credibility, suggesting motives for Eckler to testify falsely about her husband's conduct. Defense counsel questioned Eckler about her feelings regarding defendant's extramarital affairs, and her feelings about the significant sums of money she sent to defendant during the summer of 1994 which, according to Eckler's direct testimony, played a part in her ultimately declaring bankruptcy.

We further conclude that there is no reasonable probability that the outcome at trial would have been different had Eckler's testimony of spousal abuse not been admitted. Accordingly, we reject defendant's claim that trial counsel was ineffective in failing to object. See *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Evans*, 186 Ill. 2d at 94.

### *Motion in Limine Violations*

Defendant next argues that he was denied a fair trial because the prosecutor deliberately violated two *in limine* orders by introducing evidence of defendant's prior felony convictions and alleged drug activities.

Prior to trial, defendant moved to preclude evidence of defendant's prior convictions in Colorado. The trial court ruled that, for impeachment purposes, the State was allowed to introduce evidence that defendant has prior felony convictions, but that the State was not allowed to introduce evidence indicating the nature of the

felonies.[1] During the State's redirect examination of Tammy Brown, the hotel housekeeper who had a relationship with defendant, the State inquired about defendant's prior criminal conduct:

"Q. You say you thought he was joking when he said if he, if he told you anything that you knew he would kill you?

A. Well, I mean, I was in love with him. So, you know, I didn't take anything he said seriously. You know how some people may say that they have a past, you know, and I have heard people say it before. I didn't think of it as, you know, anything seriously.

Q. Well, he told you, what did he tell you about his past?

A. He didn't tell me too much about his past. I don't remember conversation, I don't remember too much. I just remember what was in my heart, what I felt about him. That's all I remember.

Q. Did you tell the police in '94, Lamont told me he was out over an assault charge, where a girl was shot?"

Defense counsel objected. Before the trial court could rule, Brown answered, "I don't remember." The trial court sustained the objection and admonished the jury to disregard the last question and answer. At the close of the State's case-in-chief, defendant moved for a mistrial based on the State's question to Brown regarding the assault charge. Defendant maintains that the trial court erred in subsequently denying his motion for a mistrial.

A trial court has broad discretion to determine the propriety of declaring a mistrial. *People v. Redd*, 135 Ill. 2d 252, 323 (1990); *People v. Jones*, 123 Ill. 2d 387, 410 (1988). "A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." *Redd*, 135 Ill. 2d at 323. Accord-

---

[1]The propriety of the trial court's *in limine* order, in light of our decision in *People v. Atkinson*, 186 Ill. 2d 450 (1999), which rejected the "mere-fact" method of impeachment, is not before this court.

ingly, the violation of a motion *in limine* will constitute a ground for mistrial only where the violation deprived the defendant of a fair trial.

The State's question regarding defendant's "assault charge, where a girl was shot" violated the trial court's *in limine* order. We do not find, however, that defendant was deprived of a fair trial. Generally, if a timely objection is made at trial to improper interrogation, the court can, by sustaining the objection or instructing the jury to disregard the question and answer, usually correct the error. *People v. Carlson*, 79 Ill. 2d 564, 577 (1980). Although situations exist where the improper question is so damaging that a trial court cannot cure the prejudicial effect (see *Carlson*, 79 Ill. 2d at 577), this is not such a situation. The State asked a single question regarding defendant's prior conviction which violated the *in limine* order. The trial court, however, immediately sustained defendant's objection and admonished the jury to disregard the question and answer. Brown's answer, which the jury heard before the objection could be sustained, indicated only that she did not recall telling police in 1994 about a prior assault. The trial court also instructed the jury at the end of the trial to disregard questions to which objections were sustained. Under these circumstances, we hold that the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

Defendant argues that the State also violated the trial court's *in limine* order barring the introduction of evidence concerning defendant's alleged drug-related activities.

During the State's redirect examination of Damie Brown, defendant's cousin, the State questioned Brown about an October 3, 1994, telephone call she received from defendant in which defendant told Brown that his car, the Merkur, was missing:

"Q. You are saying that he, Lamont, wasn't upset when he called you in the morning about the missing car?

A. No.
Q. Did he tell you what was in the car?
A. Yes.
Q. What was in the car?
A. Some marijuana."

Defendant objected. The trial court sustained the objection and, following a side-bar conference, the trial court instructed the jury to disregard the witness' last statement.

Defendant argued in his post-trial motion for a new trial that Brown's marijuana testimony violated the court's *in limine* order and that the court's admonishment to the jury could not cure the prejudice. During argument on defendant's motion, the State maintained, as it does before this court, that the prosecutor expected Brown to testify that defendant had a 9-millimeter gun in the car, and that Brown gave an unexpected response. The trial court subsequently denied defendant's post-trial motion for a new trial.

The denial of a motion for a new trial will not be disturbed on review in the absence of a showing that the trial court abused its discretion. See *People v. Pecoraro*, 144 Ill. 2d 1, 18 (1991); *People v. Miller*, 79 Ill. 2d 454, 464 (1980). We find no abuse of discretion here. The trial court apparently accepted the State's explanation that Brown's response was unexpected and unintended, and defendant points to nothing in the record to suggest otherwise. Any error arising out of Brown's unexpected testimony was cured when the trial court sustained defendant's objection and instructed the jury to disregard the testimony. Defendant does, however, cite to testimony, elicited by the State, indicating that defendant was unemployed and that he used a pager. According to defendant, the State was attempting to establish, through such testimony, as well as Brown's testimony, that defendant was employed as a drug dealer. Defendant, however, never objected to the State's inquiries

regarding his employment or use of a pager. Defendant has thus waived review of these issues on appeal. See *Enoch*, 122 Ill. 2d at 186.

### Other Trial Errors

Defendant next argues that he was denied a fair trial by (1) the prosecutor's improper examination of Tammy Brown; (2) the prosecutor's questioning of Andre Franklin concerning gang membership; and (3) the prosecutor's closing argument. Defendant failed to preserve these issues for review by failing to object at trial or by failing to raise the issues in his post-trial motion. See *Enoch*, 122 Ill. 2d at 186. Defendant, however, argues that we should review these issues under the plain error doctrine.

As already discussed, the evidence here is not closely balanced. Thus, one of the two limited circumstances under which we apply the plain error doctrine is not present. We, therefore, consider only whether the second limited circumstance justifying application of the plain error doctrine is present, *i.e.*, whether defendant's claimed errors are of such magnitude that defendant was denied a fair trial, and remedying such errors is necessary to preserve the integrity of the judicial process. See *Nielson*, 187 Ill. 2d at 297; *Macri*, 185 Ill. 2d at 58.

During the State's direct examination of Tammy Brown, she testified that defendant told her that he did not use his real name to register at the hotel because "he had trouble in Colorado." Brown also testified that when she asked defendant about his past, defendant responded, jokingly, "[I]f I tell you, I would have to kill you." The State continued its direct examination of Brown as follows:

"Q. And did he tell you that if he ever, if you ever told anyone the things—

A. Just the same as what I, that is the, just, he used to say it all the time. But never told me anything that would cause me any trouble. He never told me anything I didn't need to—

Q. Well, did he say that if you ever told anyone the things that he was telling you, he had killed before and he wouldn't think twice about doing it again?

A. Something like that."

Defendant argues that the prosecutor, through this leading question, "testified" and deliberately misled the jury concerning the nature of the conversation between Brown and defendant. Although the prosecutor's question was not in proper form, the witness clearly testified that defendant did, in fact, say "[s]omething like that." Further, on cross-examination, defense counsel asked Brown if she had any reason to believe that defendant was serious when he said that he had killed before and would not hesitate to kill again. Brown replied, "No," explaining that defendant was joking. The nature of the conversation between Brown and defendant was thus brought out on cross-examination. To the extent the State's leading question may nonetheless be deemed error, it does not rise to the level of plain error, *i.e.*, it is not so fundamental an error that defendant was denied a fair trial. See *People v. Ramey*, 151 Ill. 2d 498, 530-31 (1992) (holding that prosecutor's leading questions of prosecution witness, which defendant argued amounted to unsworn testimony, did not amount to plain error where evidence was not closely balanced and the alleged error was not so fundamental and prejudicial that defendant was denied a fair trial).

Defendant also argues that the State impermissibly attempted to lead the jury to speculate that defendant was a gang member. During the State's redirect examination of Andre Franklin, the prosecutor asked him if he belonged to a gang in 1994. Defense counsel objected, and the trial court sustained the objection. The witness never answered the question. Any error in asking this question was cured when the trial court sustained the objection and instructed the jury at the end of the trial to disregard questions to which objections were sustained.

See *People v. Coleman*, 158 Ill. 2d 319, 343 (1994) (holding that any error in prosecutor's gang-related questioning of defense witness was cured where trial court sustained objection, instructed jury to disregard the testimony, and instructed the jury at the end of trial to disregard questions to which objections were sustained); *People v. Scott*, 148 Ill. 2d 479, 550 (1992) (holding that trial court's immediate ruling on defense objection to improper question was sufficient to cure any error).

Finally, defendant cites to various comments by the prosecutor in the State's rebuttal argument that defendant claims denied him a fair trial. We consider each comment in turn.

Defendant first cites to the State's comment that investigators "eliminated a lot of people" as suspects. Defendant argues that the trial evidence showed only that Reggie Stewart was eliminated as a suspect.

In closing argument, defense counsel attacked the thoroughness of the State's investigation, stating that police immediately focused their investigation on defendant, were not open to any other possibility, and looked only for evidence of guilt, not innocence. In response, the prosecutor commented that Detective Suhre could be proud of the investigation he conducted, citing to the sheer size of the police investigatory file, including hundreds of photographs. The prosecutor concluded that police "eliminated a lot of people."

Prosecutors are allowed considerable latitude in closing argument (*People v. Buss*, 187 Ill. 2d 144, 244 (1999)), and may respond to comments that clearly invite a response (*People v. Armstrong*, 183 Ill. 2d 130, 146 (1998)). Defense counsel's comments attacking the thoroughness of the police investigation invited a response. Accordingly, we do not find that the State's comment implicates the integrity of defendant's trial.

Defendant next cites to the prosecutor's comment

regarding scientific testing of gunpowder. Defense counsel stated in closing argument that, according to the State's firearms expert, Thomas Gamboe, a test could have been performed to determine if the gunpowder in the discharged shotgun shells found at the crime scene was from the same manufacturing lot as the gunpowder in the shotgun shell recovered from defendant's storage locker. The State, however, failed to order such a test. Defense counsel also focused on the absence of any comparison testing by the State on the lead shot removed from the victims and the lead shot in the shell recovered from the storage locker. In rebuttal, the prosecutor commented that there is no scientific test that could match burnt gunpowder and fresh gunpowder.

Contrary to the prosecutor's comment, Gamboe testified that it is possible, through certain testing, to determine if the gunpowder in a fired round was from the same manufacturing lot as the gunpowder in a live round. However, Gamboe also later testified that he has never performed tests on "shotgun shot" to determine if the lead shot expended or found in a person was similar to the shot in an unfired shell. Gamboe explained that this was not his area of expertise and that he did not know the specificity and accuracy of such test results.

The State's comment regarding the gunpowder testing erroneously misstated the evidence. We conclude, however, that this error did not deprive defendant of a fair trial or otherwise result in substantial prejudice such that absent this remark, the result of the trial would have been different. See *Buss*, 187 Ill. 2d at 244-45 (applying substantial prejudice test to claim that improper argument by prosecution constituted plain error); *Coleman*, 158 Ill. 2d at 348-49 (same). During closing, defense counsel suggested that without a match on the gunpowder, the State had "no case," and that the State thus avoided testing the gunpowder. However, as defense

counsel also admitted, and as the evidence established, the shotgun shells recovered from the crime scene and the single shell recovered from defendant's storage locker were all Remington brand shells. Gamboe testified that Remington is a major brand and that he would not have been surprised if millions of Remington shells had been sold. While a match in the gunpowder would have been helpful to the State's case, the absence of a match would not have been fatal to the State's case. Thus, defendant was not substantially prejudiced by the prosecutor's misstatement.

The defendant next cites to the prosecutor's comment that defendant could have hired a DNA expert to examine the hair fragments recovered from the van. During closing argument, defense counsel questioned the reliability of the testimony of the State's hair and fiber expert and questioned why the State did not order DNA testing on the hair fragments. In rebuttal, the prosecutor commented:

"[Defense counsel] [t]alked about the DNA. Well, on the one hand it is a crucial piece of evidence, and they think it will show that it is someone else[']s hair. But gee, we don't have a couple of experts, we don't have the bucks for an expert, so we can't disprove.

On the contrary. They examined the weapons involved, why wouldn't they examine the hair if they thought that would disprove anything?"

Defendant argues that the prosecutor's comment was reprehensible because the prosecutor knew that defendant was without funds to hire a DNA expert and that the trial court denied his motion for appointment of a DNA expert. We note, however, that defendant's pretrial "Motion for Forensic DNA Expert" only requested the appointment of a DNA expert for the purpose of examining seminal material from one of the victims, not for the purpose of conducting DNA testing on the hairs recovered from the van and the hair samples taken from the

victims. We note further that the trial court granted defendant's "Motion for Forensic Hair Expert," but that defendant never called such an expert at trial. Based on this record, the State's comment was reasonable, and no error occurred. See *People v. Holman*, 103 Ill. 2d 133, 151 (1984) (noting that Illinois courts have consistently held that comment on the failure of a potential defense witness to testify is permitted when made in response to defense counsel's own reference to State's failure to call the witness to the stand).

Finally, defendant takes issue with the prosecutor's comment concerning certain telephone records. At trial, the State established the time of the shootings as 1:30 a.m. on October 4, 1994. Defendant's mother testified, however, that defendant placed a telephone call to her at 1:30 a.m. on October 4. Defendant testified consistently with his mother. The obvious import of this testimony is that defendant could not be in two places at the same time. In rebuttal, Detective Suhre testified that there are telephones at a gasoline station two to three miles from the crime scene. In other words, defendant could have committed the crimes, and called his mother shortly thereafter, giving himself an alibi.

Defense counsel commented during closing argument that there was no evidence that a telephone call had been placed to defendant's mother from the telephones suggested by the State. Defense counsel pointed out that any call made from a telephone near the Illinois crime scene to the St. Louis, Missouri, home of defendant's mother would be a toll call and that there would have been a record of the call. No records were placed into evidence. In response, the prosecutor commented that to avoid a toll call, defendant merely had to go across the river, less than two miles away, to a rest stop and place the telephone call at that location. The prosecutor also commented that "everything was checked" and that

there are no telephone records. The trial court overruled defendant's objection, indicating that the State may respond to defense counsel's argument.

A prosecutor's comments must be considered in the context of the parties' arguments as a whole and their relationship to the evidence. See, *e.g.*, *People v. Madej*, 177 Ill. 2d 116, 161 (1997). In the present case, the prosecutor's comment went beyond the evidence, as there was nothing in the record to support his comment that "everything was checked" and that there were no records for the telephone at the rest stop. Nonetheless, the prosecutor's argument as a whole properly focused on the evidence and the facts of the case. Further, the trial court properly instructed the jury on the purpose of closing argument, and that any statement or argument made by the attorneys which is not based on the evidence should be disregarded. We do not believe, therefore, that any error is of such magnitude that defendant was denied a fair trial.

### Cumulative Error

Defendant argues that even if no individual error warrants reversal of his conviction, the cumulative effect of error deprived him of due process and a fair trial.

Individual trial errors may have the cumulative effect of denying a defendant a fair trial. *People v. Speight*, 153 Ill. 2d 365, 376 (1992). This court's recent decision in *People v. Blue*, 189 Ill. 2d 99 (2000), which defendant cites as additional authority in support of his argument, illustrates this proposition of law. However, the extreme circumstances present in *Blue*, which compelled this court to reverse the defendant's conviction and to order a new trial, are not present here.

As discussed above, we have rejected many of defendant's claims of error. We held that the trial court did not abuse its discretion in denying defendant's motions for a new trial. We held that trial counsel was not inef-

fective in failing to object to evidence of spousal abuse. We held that any error in the State's examination of Andre Franklin was cured by the trial court's action in immediately sustaining defendant's objection. We found no error in certain of the prosecutor's comments in rebuttal closing. Finally, we found that the balance of the errors claimed by defendant were not plain error. Accordingly, defendant is not entitled to a new trial on the basis of cumulative error.

### III. Sentencing Issues

#### *Hearsay Evidence in Aggravation*

Defendant next argues that he was denied a fair sentencing hearing because the State improperly introduced unreliable hearsay evidence during the aggravation and mitigation phase of his death penalty hearing that portrayed defendant as a drug dealer. Defendant cites to the testimony of Detective Suhre, in which Suhre read from statements given by Cortez Starks, David Anthony Turner and Tammy Witt to officers investigating the Masters-Beasley murders.

Suhre testified that Starks' statement was taken by Detectives Staicoff and Hoolihan. The record indicates that the statement was taken on October 13, 1994. According to Starks' statement, defendant and Andre Franklin "hooked up," and Franklin started selling crack cocaine for defendant. Turner's statement, which was taken by Detectives Wells and Suhre on October 10, 1994, indicates that Turner met defendant through his sister-in-law, Tammy Brown. Defendant told Brown that defendant had been selling drugs all his life, including cocaine and marijuana. Finally, Witt's statement, which was taken by Detectives Sandidge and Staicoff on October 28, 1994, indicates that defendant told Witt that defendant was selling crack cocaine. On a couple of occasions, Witt delivered cocaine to one of defendant's

customers, and agreed to sell marijuana for defendant. Defendant contends that absent sufficient indicia of reliability, these statements should not have been admitted.

In order to preserve this issue for appeal, defendant was required to make a contemporaneous objection at the sentencing hearing and to raise the issue in a post-sentencing motion. See *People v. Mahaffey*, 166 Ill. 2d 1, 27 (1995). Defendant did neither. Accordingly, we agree with the State that the issue is waived. Defendant, however, urges this court to apply the plain error doctrine.

A defendant's waiver of a capital sentencing issue will be excused under the plain error doctrine where the evidence is closely balanced or where the error is of such magnitude that the defendant was deprived of a fair sentencing hearing. *Cortes*, 181 Ill. 2d at 289; *People v. Simms*, 143 Ill. 2d 154, 170 (1991). We consider first whether error occurred and, if so, whether it amounts to plain error.

During the aggravation and mitigation phase of a capital sentencing hearing, the rules of evidence are relaxed. See 720 ILCS 5/9—1(e) (West 1994); *People v. Terrell*, 185 Ill. 2d 467, 504-05 (1998). Evidence is admissible as long as it is relevant and reliable. *People v. Jackson*, 182 Ill. 2d 30, 74 (1998); *People v. Mulero*, 176 Ill. 2d 444, 472 (1997). Hearsay evidence, including hearsay evidence of crimes which did not result in prosecution or conviction, is admissible as long as the evidence satisfies the relevancy and reliability requirement. *People v. Williams*, 181 Ill. 2d 297, 331 (1998); *People v. Jackson*, 145 Ill. 2d 43, 115 (1991). The determination of whether evidence is relevant and reliable is left to the discretion of the sentencing judge. *Jackson*, 145 Ill. 2d at 115.

Defendant challenges only the reliability, and not the relevance, of Detective Suhre's testimony. As to the issue of reliability, defendant acknowledges that there was

other evidence presented at the hearing which corroborated some of defendant's alleged drug activities. Prior to the introduction of the three hearsay statements, Detective Suhre identified certain items seized from defendant's storage locker: a tri-beam scale, which Suhre testified is the type of scale commonly used in the drug trade, and a plastic bag, bearing defendant's fingerprint, that contained 300 grams of marijuana. In addition, Annette Tahcsa, who spent two weeks with defendant during the summer of 1994, testified that she witnessed defendant engaging in drug transactions. In a couple of instances, the buyers came to his motel room. A couple of times, Tahcsa drove defendant in her vehicle so that he could make the sale. On one occasion, defendant left some marijuana and crack cocaine in her vehicle. This corroborating evidence, coupled with the fact that the hearsay statements at issue were taken during the course of an official investigation, lead us to conclude that the trial court did not abuse its discretion in admitting Suhre's testimony. See *People v. Cloutier*, 178 Ill. 2d 141, 158 (1997) (holding that trial court did not abuse its discretion in admitting hearsay testimony of other crimes in light of corroborating testimony of other witnesses); *People v. Foster*, 119 Ill. 2d 69, 98-99 (1987) (holding that trial court did not abuse its discretion in finding officer's hearsay testimony reliable, notwithstanding lack of corroboration, where information was compiled during an official investigation and evidence was never directly challenged). We recognize that some of Suhre's testimony constitutes double hearsay. Nonetheless, because at least part of the double hearsay was corroborated, we find no error in its admission. See *People v. Erickson*, 117 Ill. 2d 271, 300 (1987) (noting that where this court has sanctioned the admission of double hearsay at least some parts of the double hearsay have been corroborated by other evidence).

In the alternative, defendant argues that counsel's failure to object to Suhre's testimony denied him the effective assistance of counsel. Claims of ineffective assistance of counsel at a capital sentencing hearing are reviewed under the two-pronged *Strickland* standard. *People v. Coleman*, 183 Ill. 2d 366, 403 (1998); *People v. Henderson*, 171 Ill. 2d 124, 145 (1996). Defendant must show that counsel's performance fell below an objective standard of reasonableness, and that absent counsel's errors, there is a reasonable probability that the sentencer would have concluded that the balance of aggravating and mitigating factors did not warrant the death penalty. *Coleman*, 183 Ill. 2d at 403; *Henderson*, 171 Ill. 2d at 145. Defendant has failed to satisfy either prong of the *Strickland* standard.

We have already concluded that no error occurred in the trial court's admission of Detective Suhre's testimony. Counsel's failure to object to such testimony cannot, therefore, be deemed deficient. Moreover, defendant cannot demonstrate prejudice.

The State presented extensive evidence in aggravation. In addition to Detective Suhre's testimony concerning the drug-related items seized from defendant's storage locker, and Annette Tahcsa's testimony concerning defendant's drug sales, the State presented evidence that defendant had made threats to Masters and others. Juanita Lane testified that Masters said that she had learned a lot about defendant, and that defendant had told Masters that if she ever told anyone about him, he would kill her. Tracy Hite Hughes testified that she overheard a portion of a telephone conversation between Masters and defendant. Masters told Hughes that defendant said he would kill Masters if she ever told anyone about him. Tahcsa further testified that defendant told her that if her boyfriend did not stop calling at the motel where defendant and Tahcsa were staying, he was going to get

"popped." Tahcsa understood that "popped" meant "shot." Tahcsa also testified that defendant threatened "Dre" over some unpaid money, and that defendant told her something would happen to her if she did not return the drugs he had left in her vehicle. Tahcsa stated that, out of fear, she checked herself into a drug rehabilitation center the day following defendant's threat.

The State also introduced into evidence defendant's prior convictions in the State of Colorado. In July 1990, defendant was convicted of second degree assault, a misdemeanor, stemming from an April 1990 incident in which defendant fired a handgun twice, in rapid succession, at a group of people, including a former girlfriend, who were standing outside a night club. Two persons were injured. The former girlfriend told police that defendant aimed the gun directly at her and pulled the trigger, but the gun jammed. Defendant was sentenced to one year of imprisonment on each of two counts, to run concurrently.

In November 1991, defendant pled guilty to tampering with evidence. The charge arose out of an incident in July 1991, in which defendant's handgun was used in the course of a suicide. Defendant took the weapon from the scene. Defendant was sentenced to two years' imprisonment. The presentence investigation report indicates that defendant is a "high risk person to re-offend and/or to fail to comply with his conditions of probation."

In February 1992, defendant pled guilty to vehicular eluding. Defendant was sentenced to 2½ years' imprisonment.

In June 1992, defendant was convicted by a Colorado jury of second degree assault, "crime of violence," criminal mischief, and reckless endangerment. The charges arose out of a November 1991 incident in which several shots were fired from a vehicle, driven by defendant, at another vehicle in which two women and a

small child were riding. The presentence investigation report notes that defendant has "an extensive history of assaultive behavior, as well as a reputation for possession of firearms," and that defendant "is a definite threat to the safety of others." The report recommended that defendant receive the maximum aggravated sentence. Defendant was sentenced to consecutive sentences of 12 years on each of two counts of second degree assault, 8 years for criminal mischief to run concurrently, and 6 months for reckless endangerment, also to run concurrently. The judgment in that case was affirmed on appeal. Defendant was released on bond, and in October 1992, defendant became a fugitive from bond.

The State also offered victim impact statements from Patricia Hoffman, Masters' mother; Tequila Green, Beasley's cousin; Ramon Beasley, Beasley's brother; and Chelsea Beasley, Beasley's seven-year-old sister. Beasley's aunt, Patricia Green, testified as to the profound effect Beasley's death has had on the family.

In mitigation, defendant's mother, Eliza Madison, testified that defendant was a high school graduate who had a college scholarship. Because defendant was tired of school, he enlisted in the army, in which he served for eight years. Madison believed that her son could be rehabilitated, but that he is not guilty of the murders of Beasley and Masters. She also testified that the trial has taken its toll on the family, in particular, defendant's 16-year-old brother.

In light of the extensive evidence in aggravation and the scant evidence in mitigation, even if Detective Suhre's hearsay testimony had been excluded, no reasonable probability exists that the jury would have found that the balance of aggravating and mitigating circumstances did not warrant death. Because defendant cannot demonstrate prejudice from counsel's failure to object to Suhre's hearsay testimony, we reject defendant's claim that counsel was ineffective.

Constitutionality of Death Penalty Statute

As a final matter, defendant argues that the Illinois death penalty statute (720 ILCS 5/9—1 (West 1994)) is unconstitutional. Defendant first contends that inadequate procedural safeguards create a risk that irreparable punishment will be applied to innocent persons. Defendant seeks to distinguish this argument from that raised by the defendant, and rejected by this court, in *People v. Bull*, 185 Ill. 2d 179 (1998).

In *Bull*, defendant argued that the death penalty statute is unconstitutional because of the inevitability that innocent persons will be wrongly convicted, and that no amount of procedural due process can prevent all of the errors which can result in an innocent person being convicted of a capital crime. Although defendant here does not mount a wholesale attack on the criminal justice system, as did the defendant in *Bull*, both arguments concern, to some extent, the adequacy of procedural safeguards. Where the defendants' arguments differ is in whether the present system is capable of being fixed. The defendant in *Bull* maintained that no amount of process can remedy the inherent fallibility of the system. Here, defendant suggests that with more procedural safeguards, the death penalty statute could pass constitutional muster. This difference does not persuade us that the reasoning we employed in *Bull* for rejecting the defendant's constitutional challenge does not also apply here. As we noted in *Bull*, the American criminal justice system "provides the maximum protection necessary to guard against mistakes being made." *Bull*, 185 Ill. 2d at 215. We further observed that much in the way of efficiency is sacrificed in order to protect the individual and that the legislature, as well as this court, have included additional safeguards with the many protections that a criminal defendant enjoys. *Bull*, 185 Ill. 2d at 215-16.

Our conclusion that *Bull* is dispositive of defendant's argument finds additional support in *People v. Brown*,

185 Ill. 2d 229 (1998). In *Brown*, defendant argued that because it was inevitable that innocent persons may be put to death, and that because no sentencing scheme could be devised that would always prevent the execution of innocent persons, the present sentencing scheme must be considered unconstitutional. In rejecting this argument, we relied on our decision in *Bull*, in which we "concluded that the sentencing system possesses sufficient safeguards to withstand constitutional scrutiny." *Brown*, 185 Ill. 2d at 260. We see no reason to reach a different result in this case.

Defendant raises additional challenges to the constitutionality of the death penalty statute, all of which have been previously rejected by this court. We have held that the death eligibility factor for murder committed in a "cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design" (see 720 ILCS 5/9—1(b)(11) (West 1994)) is not unconstitutionally vague. *People v. Williams*, 193 Ill. 2d 1, 27-37 (2000); *People v. Burton*, 184 Ill. 2d 1, 37 (1998); *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993). We have also held that the death penalty statute does not place an unconstitutional burden of proof on the defendant that precludes meaningful consideration of mitigating circumstances. *Gilliam*, 172 Ill. 2d at 522; *People v. Fair*, 159 Ill. 2d 51, 95 (1994). We have held that the death penalty statute is not unconstitutional for allowing the sentencer to consider "any other reason" the defendant should be sentenced to death. *People v. Johnson*, 182 Ill. 2d 96, 112-13 (1998); *People v. Taylor*, 166 Ill. 2d 414, 439 (1995). Further, we have repeatedly rejected claims that the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. See *Johnson*, 182 Ill. 2d at 113. Because defendant offers no compelling reason for reconsidering these holdings, we adhere to our prior decisions. We also reject

defendant's contention that individual features of the death penalty statute, which this court has found constitutional, when considered in their totality, render the statute unconstitutional. "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." *People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989).

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed. We direct the clerk of this court to enter an order setting Thursday, January 18, 2001, as the date on which the sentence of death, entered by the circuit court of Madison County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE HEIPLE, specially concurring:

I concur in the majority's affirmance of defendant's murder convictions and death sentence. I write separately, however, because one of the two factors upon which defendant was found eligible for the death penalty cannot withstand constitutional scrutiny.

A jury found defendant eligible for the death penalty on two separate grounds: defendant was convicted of murdering two or more persons (720 ILCS 5/9—1(b)(3) (West 1994)), and defendant committed the murders in a "cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design" (720 ILCS 5/9—1(b)(11) (West 1994)). The majority rejects defendant's constitutional challenge to this second eligibility factor, holding section 9—1(b)(11) is not unconstitutionally

vague. I disagree. As I wrote recently in *People v. Williams*, 193 Ill. 2d 1, 58 (2000) (Heiple, J., concurring in part and dissenting in part), the phrase "preconceived plan, scheme or design" defies explicit definition. A finding that the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life does little more than describe the *mens rea* of any intentional murder. It is difficult to imagine a case of intentional murder in which the evidence would not be sufficient for such a finding. Indeed, if premeditation did not in fact exist to some extent, it might be argued that the killing was accidental or inadvertent. I fail to see how the phrase "preconceived plan, scheme or design" provides any greater limitation upon a sentencer's discretion.

> "It is unclear from the language of the statute whether a defendant must have harbored the plan to kill for a second, a minute, an hour, or some other undefined period. Where the language of the statute is so vague that this court is incapable of formulating a standard for its application, such a statute necessarily provides insufficient guidance to a sentencer charged with determining whether a defendant is eligible to be put to death." *Williams*, 193 Ill. 2d at 61 (Heiple, J., concurring in part and dissenting in part).

Thus, as I concluded in *Williams*, the statute fails to provide sufficient guidance to a sentencer and is unconstitutionally vague.

I would affirm defendant's eligibility for the death penalty based solely on the fact that defendant committed two or more murders. See 720 ILCS 5/9—1(b)(3) (West 1994).

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

Although I am not as impressed by the magnitude of the evidence against Hall as my colleagues are, I agree that we should not disturb the jury's guilty verdicts. I dissent only from that portion of the majority's opinion

dealing with the validity of this state's death penalty statute. Contrary to my colleagues, I believe that Hall's challenge to the statute is meritorious. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Hall's sentence of death should therefore be vacated and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994). Because Hall was found guilty of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1994).