No. 2-08-0608    Filed: 9-21-10

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--3304 |
| RODNEY L. McCULLOCH, | ) ) | Honorable Michael J. Burke, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the opinion of the court:

Rodney L. McCulloch appeals convictions of three counts of perjury (10 ILCS 5/29--10(a) (West 2004)) and one count of disregarding the Election Code (10 ILCS 5/29--12 (West 2004)). He contends that the evidence was insufficient to show that he signed election petitions knowing that his statements in the petitions were untrue. We affirm.

I. BACKGROUND

McCulloch was charged with three counts of perjury, one count of disregarding the Election Code, and three counts of forgery (720 ILCS 5/17--3(a)(2) (West 2004)) in connection with signatures he obtained in order to place James H. Gumm on the ballot for Milton Township assessor. A bench trial was held.

Gumm testified that, in January 2005, he was the Milton Township assessor and he decided to run for reelection. He hired McCulloch to assist in obtaining the required number of signatures

in order to be placed on the ballot. The petition sheets with those signatures were due on January 25, 2005. The sheets included a certification section under which the person submitting the petitions swore that the signatures on them were signed in his or her presence and were genuine. See 10 ILCS 5/10--4 (West 2004) (requiring this attestation).

Gumm testified that, on January 25, 2005, several people arranged to meet at an attorney's office to collect petitions. McCulloch dropped off his petition sheets, including sheet numbers 1, 4, and 5. Gumm testified that McCulloch arrived in a hurry and immediately asked to be paid, but was advised that he would have to wait until the petition sheets were notarized. Gumm stated that, after McCulloch left, he noticed that the addresses on sheets 1, 4, and 5 were not sequential, which he thought was odd. He also noted that the sheets did not appear to have water marks or signs of outdoor wear, even though they would have been used during a "tremendous snowstorm."

Melissa Piwowar, a notary and paralegal, testified that she was responsible for notarizing the petition sheets. She stated that, when McCulloch gave her his petitions, she complimented his ability to obtain so many signatures during inclement weather. McCulloch told her that he recruited a team of people to collect signatures and that he would park at the end of a street while they walked up and down it. Piwowar then immediately expressed concern about notarizing the petitions if McCulloch had not personally collected the signatures. Piwowar said that McCulloch then told her that he was standing next to the crew members collecting the signatures and that, although a person on his team might have been holding the clipboard, he was there. Piwowar then notarized the petitions.

Piwowar testified that, after several more people dropped off petitions, it turned out that there were more than were needed and there was a discussion about which ones to use. Piwowar stated that some could not be notarized because the individuals who collected the signatures were not there

to sign the petitions. She testified that McCulloch then said that she "didn't understand the shortcuts or the way these things worked." Fourteen people testified that their signatures that appeared on petition sheets 1, 4, and 5 were not actually their signatures.

McCulloch testified that he had worked as a political consultant for over 20 years. He said that he collected signatures using a "walk sheet," which is a list of registered voters in the jurisdiction, organized either by street address or alphabetically. He stated that petitions are often challenged, even if frivolously, and that one way to prevent that is to stagger the signatures on the petition instead of taking them in order. Then, it would be more work for a person mounting a challenge to check the signatures within the time frame available for doing so. He testified that standard practice is to obtain twice the minimum number of signatures in order to be sure that there are enough legitimate signatures. Registered voters must sign the petition, but anyone can fill in their addresses.

McCulloch testified that he became involved with Gumm's campaign about a week before the filing deadline. A friend contacted him about helping with the campaign and informed him that they needed about 500 signatures. McCulloch believed that he could obtain those within a week. McCulloch assembled a crew consisting of an acquaintance, a friend of that acquaintance, a homeless man whom McCulloch had met earlier, and a friend of the homeless man. McCulloch stated that he charged the campaign $1.50 per signature and that the fee was passed on to the crew. He did not expect to profit from that particular campaign.

McCulloch stated that, on the Saturday before the deadline, he gave the group instructions, walk sheets, and petitions. He told them that they must first ascertain whether a person was a registered voter and that they could not put anything in the signature space, but could fill in the address section. He also instructed them on how to stagger the signatures, by either using

nonsequential lines on the same page, mixing up the pages, or randomly filling in pages. McCulloch testified that the group collected signatures at the Wheaton post office and that he positioned himself where he could see each signature. McCulloch said that, in residential areas, two people went down one side of the street and two people went down the other side. He said that he sat in a van, saw the crew knock on doors, saw them pass clipboards, and saw people sign. Sometimes no one came to the door and sometimes people came but did not sign.

McCulloch testified that, in one neighborhood, the driveways were long, the process took too much time, and McCulloch had problems seeing properly. Because of that, he then chose a more densely populated area with short walkways. During the Saturday collection, it began to snow, and McCulloch told the group to put their walk sheets on top of the petitions to keep them dry. He disputed testimony from others who said that the snow was heavy. At the end of the day, McCulloch allowed the crew to keep the petitions. He said that he did not review them at that time and did not pay the crew at that time.

The next day, the group met again and followed a similar process. That evening, McCulloch received a request for more signatures. He allowed the crew to again keep the petitions and he did not look at them. The crew met again on Monday and followed the same process of collecting signatures, and McCulloch collected the petitions at the end of the day. McCulloch stated that he collected more signatures at a train station on Tuesday and then delivered the petitions.

According to McCulloch, Piwowar commented that she was impressed by the number of signatures that he collected, and he replied that he did not personally hand the clipboard to every person. He said that he told Piwowar that he used a crew but that he personally observed their collection of signatures. He stated that he would not have signed the petitions if he had not seen

people sign them. Someone suggested that Piwowar notarize them anyway, and McCulloch said that he did not think they should take that short cut.

McCulloch testified that he signed the petition sheets and that "each and every signature to the best of my belief was signed in my presence." He said that he believed the attestations that he signed were true and that he did not believe that any of his crew falsified signatures. Gumm's campaign paid him, and he then paid the crew. McCulloch stated that it later came to his attention that the signatures had been challenged. He did not attempt to locate the crew at that time, but his attorney later tried to find them without success.

The trial court acquitted McCulloch on the forgery counts, determining that the use of the crew, who were allowed to keep the petitions overnight, prevented McCulloch from knowing that the signatures had been forged. The court then found him guilty on the perjury counts, stating that, if the crew committed the forgeries without McCulloch's knowledge because he was not supervising them well, he could not also maintain that he saw the signatures being made. The court further found that the documents were not signed in McCulloch's presence when he was sitting in a van in the street. The court discounted McCulloch's testimony that he believed the signatures were made in his presence, stating that, with two people on each side of the street in a snow storm, there was "no way" McCulloch could say with any certainty that he had a reasonable belief that the signatures were made in his presence. The court also characterized as "ridiculous" the idea that McCulloch could watch the crew get every signature. The court further stated that it believed Piwowar's testimony that, after she expressed concern about notarizing the petitions, McCulloch stated that he was next to the crew members when they obtained the signatures.

McCulloch moved for a new trial. When denying the motion, the court stated that it was impossible for McCulloch to have seen each signature. Repeating Piwowar's testimony that, after

she questioned him, McCulloch said he was standing next to the workers, the court stated that McCulloch clearly knew that he had done something wrong. McCulloch was sentenced to probation, community service, and various fines and costs. He appeals.

II. ANALYSIS

McCulloch contends that the evidence was insufficient to show that he signed the petitions knowing that his attestations were false. He argues that the petitions were signed in his presence, even if he was sitting in a van in the street. In the alternative, he argues that, even if he could not legally be viewed as present for the signatures, he subjectively believed that his actions were sufficient, and thus the State failed to prove that he did not believe that his attestations were true.

When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) People v. Collins, 106 Ill. 2d 237, 261 (1985), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

McCulloch was convicted under the perjury provision of section 29--10(a) of the Election Code, which provides that "[a]ny person who makes a false statement, material to the issue or point in question, which he does not believe to be true, in any affidavit, certificate or sworn oral declaration required by any provision of the Code shall be guilty of a Class 3 felony." 10 ILCS 5/29--10(a) (West 2004). Section 29--12 provides that "[a]ny person who knowingly (a) does any act prohibited by or declared unlawful by, or (b) fails to do any act required by, this Code, shall, unless a different punishment is prescribed by this Code, be guilty of a Class A misdemeanor." 10 ILCS 5/29--12 (West 2004).

McCulloch first contends that the signatures were made in his presence when he was in a van in the street but still could see the people signing the forms.

If the person circulating a petition actually saw each of the signatories sign it, there is no violation of the statutory requirements, even if he or she did not physically present the petition to some of them. Ramirez v. Andrade, 372 Ill. App. 3d 68, 74-75 (2007); Moscardini v. County Officers Electoral Board, 224 Ill. App. 3d 1059, 1062-63 (1992). Instead, a signature is made in the petition circulator's presence when he or she had ample opportunity to see the signature being made. See Moscardini, 224 Ill. App. 3d at 1062 (applying by analogy the requirement for witnessing a will in the decedent's presence).

In Moscardini, signatures on a campaign petition were challenged and affidavits were provided from people who averred that they did not sign the petitions in the presence of the circulator. However, the circulator averred that, because of a medical condition that made walking painful, she did not walk to the front door of every residence. Instead, she stood 20 feet or less away while another person took the petitions to the door. She averred that she saw all of the signatories actually place their signatures on the petitions and provided affidavits from the people who assisted her to corroborate her statements. Moscardini, 224 Ill. App. 3d at 1060-61. We held that the circulator need not be the person who actually hands the petition to the signatory and that the signatures were made in the circulator's presence because she not only had ample opportunity to see the signatures being made, but she also actually saw them. Moscardini, 224 Ill. App. 3d at 1062.

In Ramirez, the First District applied Moscardini to a case involving a circulator's use of a vehicle. There, after signatures were challenged, a hearing examiner for the election board stated in his written report that the circulator " 'testified credibly that she was either physically standing at the door when the petition sheet was handed to the signer, or in the car, driving in lockstep with

those who physically tendered the documents to the signers.' " Ramirez, 372 Ill. App. 3d at 72. The examiner concluded that the objector failed to meet her burden of proof that the circulator was not " 'present,' " because she did not establish how far the circulator was from the doorsteps when the petitions were signed. The examiner said: " 'Some doorsteps in Chicago are within a few feet of the curb. Others are more than 100 feet away. *** The objector had the ability to bring in such evidence *** yet at the close of the evidence this question remained unanswered.' " Ramirez, 372 Ill. App. 3d at 72. The trial court reversed the board, finding that there was " 'no way' " the circulator could have seen the voters sign the petitions. Ramirez, 372 Ill. App. 3d at 73. The First District then reversed the trial court, concluding that, under the standard of review, the board's decision to allow the signatures was not clearly erroneous because it was based on credible evidence that the circulator saw the signatures being made. Ramirez, 372 Ill. App. 3d at 75.

Here, the trial court found that McCulloch could not have seen every signature being made when he was driving in the street during a snow storm with crews working on both sides of the street. That determination was reasonable. Although McCulloch disputed it, there was testimony that there was a heavy snow storm, and McCulloch admitted that he had crews working opposite sides of the street. Thus, it was reasonable for the court to conclude that he could not have seen every signature.

McCulloch contends that, under Ramirez, his act of driving in the street made him present as a matter of law, but Ramirez does not stand for that proposition. Instead, in Ramirez, applying a "clearly erroneous" standard of review, the court determined that, under the specific circumstances of that case, there was credible evidence to support the initial finding that the circulator saw the signatures being made. Here, the trial court did not find credible evidence of that fact and instead pointed to evidence that allowed it to reasonably conclude that McCulloch did not have ample

-8-

opportunity to see the signatures. Thus, the court reasonably concluded that McCulloch was not present when the signatures were made.

McCulloch next argues that, even if his act of driving in the street was not sufficient for him to be present, he believed that it was, making a perjury conviction inappropriate because he subjectively believed that his attestations were true.

Under the perjury section of the Criminal Code of 1961 (720 ILCS 5/32--2 (West 2004)), which is substantially similar to section 29--10 of the Election Code, "[a]n essential element of the crime of perjury is knowledge of the falsity of the statement at the time of the utterance." People v. Drake, 63 Ill. App. 3d 633, 635 (1978). "[A]n opinion or a conclusion may not be the basis of a perjury charge, even if the underlying premise upon which that opinion or conclusion is based is later proved incorrect or erroneous." Drake, 63 Ill. App. 3d at 635. "This general rule, however, that a charge of perjury may not be based upon belief or opinion, is subject to the qualification that such a statement of belief or opinion may constitute perjury when, as a matter of fact, the witness had no such belief or opinion." Drake, 63 Ill. App. 3d at 635.

A criminal conviction may be based on circumstantial evidence, as long as it satisfies proof beyond a reasonable doubt of the charged offense. People v. Hall, 194 Ill. 2d 305, 330 (2000). Circumstantial evidence is "proof of facts and circumstances from which the trier of fact may infer other connected facts which reasonably and usually follow according to common experience." People v. Stokes, 95 Ill. App. 3d 62, 68 (1981). Further, it is the responsibility of the trier of fact to assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from the evidence, and this court will not substitute its judgment for that of the trier of fact on these matters. People v. Ortiz, 196 Ill. 2d 236, 259 (2001).

Here, there was compelling circumstantial evidence that McCulloch did not actually believe that his attestations were true. The trial court specifically believed Piwowar's testimony that McCulloch first said that he was in a vehicle but, after she expressed concern about notarizing the petitions, he changed his story and stated that he was next to the crew members when the signatures were made. The court found this to be evidence that he knew that he had done something wrong. The court also specifically stated that it did not believe McCulloch. Further, there was evidence that McCulloch behaved suspiciously by seeking payment quickly and by defending his understanding of "shortcuts" in the process.

In sum, the court made reasonable determinations about the credibility of the witnesses and reasonably applied circumstantial evidence to determine that McCulloch did not believe that his attestations were true. Accordingly, the evidence was sufficient to sustain its decision to convict him of perjury and of disregarding the Election Code.

### III. CONCLUSION

The evidence was sufficient to support the convictions. Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

O'MALLEY and JORGENSEN, JJ., concur.