NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 180570-U

NO. 4-18-0570

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DARMEL L. SMITH, | ) | No. 13CF1978 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Heidi N. Ladd, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Steigmann and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding defendant's amended postconviction petition failed to make a substantial showing of a constitutional violation.

¶ 2    Defendant, Darmel L. Smith, appeals from the second-stage dismissal of his amended petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 to 122-7 (West 2016)). Defendant, proceeding *pro se*, argues this court should reverse the trial court's judgment because his amended postconviction petition made a substantial showing of a constitutional violation. We disagree and affirm.

¶ 3                               I. BACKGROUND

¶ 4                    A. Information and Preliminary Hearing

¶ 5    In December 2013, the State charged defendant by information with four counts of

first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2012)) for the unlawful killing of Sheena Williams.

¶ 6    At a preliminary hearing that same month, the State questioned a detective about a video recording from a bus defendant rode on the date of Sheena's murder. The detective stated the video showed defendant (1) requesting and receiving a cell phone from his brother, (2) manipulating the cell phone and then putting it up to his ear as if a call was placed, and (3) pulling out a folding knife and placing the blade to his own neck. The State questioned whether defendant placed the blade to his neck while speaking on the cell phone, to which the detective stated, "Yeah, I don't—you can't tell whether he's actually talking on the phone, but he has the phone up to his ear, and he's manipulating the knife, simultaneously to that." The State also questioned the detective about records for cell phones owned by Sheena and defendant's brother. The detective stated the cell phone records showed a text message was sent from the cell phone of defendant's brother to the cell phone of Sheena and then, within the same minute, an "attempt" was made to call Sheena's cell phone from the cell phone of defendant's brother "but it appears that that call goes to voicemail."

¶ 7                                B. Jury Trial

¶ 8    In December 2014, the trial court conducted a jury trial. During opening statements, the State stated, in part, it believed the evidence would show the day prior to Sheena's murder, defendant told police he would return an iPad to Sheena that he had taken from her without permission. The State also commented on defendant's use of his brother's phone on the day of Sheena's murder: "I believe the evidence will show that the contact he was making on his brother's

- 2 -

cell phone *** was with the victim, Sheena Williams. Why? Most likely to set up a meeting. I'm here. I'm coming."

¶ 9          The State elicited testimony from multiple detectives and police officers, Sheena's mother, sister, and landlord, a forensic pathologist, members of the coroner's office, defendant's roommate, and a woman who gave defendant a ride in her vehicle on the date of the murder. The State introduced the pathologist's examination report, as well as multiple photographs of Sheena's home and surrounding area, her body, her cell phone, recovered text messages, defendant's apartment, defendant's cell phone, and the clothes, shoes, and backpack defendant wore on the date of Sheena's murder. The State also introduced evidence of audio- and video-recorded interviews of defendant at the police station and video recordings from multiple buses defendant rode on the date of Sheena's murder. Other than moving for the admission of a store receipt from the woman who gave him a ride on the date of the murder, defendant did not present any evidence. The following is gleaned from the evidence presented.

¶ 10          Sheena and defendant had an off-and-on relationship for over two years, during which defendant primarily lived with Sheena and her two minor sons in her rented home. The home was adjacent to the home of Sheena's mother. The landlord gave Sheena three keys when she moved into the home, and he kept three keys. Sheena's mother recalled Sheena having three keys but, at some point, one of the keys went missing. Sheena and defendant each had a key to the home.

¶ 11          On September 2, 2013, the relationship ended, and defendant moved out. Defendant stated he moved out of the home because he was tired of dealing with Sheena's family, who lived

next door. While moving out, defendant admittedly stole an iPad. That same day, Sheena texted her landlord about having the locks on her home changed because she lost a key. The landlord indicated he could change the locks but Sheena would have to pay for it. She indicated she did not have the money. The landlord also asked whether Sheena had her rent money. Sheena did not respond until September 6, 2013.

¶ 12        In the days after defendant moved out of the home, Sheena and defendant continued to communicate regarding the iPad. Defendant admittedly sold the iPad to a third party the day after moving out but nevertheless implied to Sheena he would return it to her. On September 5, 2013, Sheena reported the theft of the iPad to police. A police officer called defendant on his cell phone from Sheena's cell phone to ask about the stolen iPad. After speaking with the officer, defendant indicated his cell phone stopped working. That night, Sheena and her sons spent the night at her mother's home.

¶ 13        On September 6, 2013, at 2 a.m., defendant stated he went to Sheena's home to have sex with her. After using his key to enter the home, defendant discovered the home was empty. Defendant assumed Sheena was staying with her mother. Defendant left the home, locking the door behind him, and decided not to go next door. Defendant indicated he was not upset Sheena was not home. He also stated, however, he was so "pissed off," he discarded his key to the home. Defendant could not remember where he discarded the key. He then went back to an apartment where he had been staying to sleep.

¶ 14        Around 9 a.m., Sheena left her mother's home to drive her youngest son to school and then pick up her niece from her sister's home. After picking up her niece, she briefly returned

to her mother's home with her niece. She stayed for a couple of minutes and then, at approximately 10 a.m., went home, leaving her niece with her mother. At 10:23 a.m., Sheena texted her landlord and told him she had $400 in rent money and he could come pick it up when he wanted. The landlord never collected the money. At 10:33 a.m., (1) Sheena's sister called Sheena's cell phone and her call went to voicemail, (2) a call was made from Sheena's phone to her voicemail, and (3) Sheena's cell phone ceased to be connected to cell service.

¶ 15       Sheena's mother became concerned when Sheena did not return. She called Sheena's cell and house phones but received no response. Sheena's mother went next door and knocked on the front and back doors, both of which were locked, and called through the mail slot. She received no response.

¶ 16       Around 11 a.m., Sheena's sister arrived at their mother's home. Sheena's sister and mother attempted to contact Sheena by knocking on her doors, yelling for her to come out, and calling her phone. With no success, her sister requested assistance from the police. A police officer responded and spoke with her mother, as her sister previously left. The officer concluded he did not have probable cause to enter the home as nothing appeared out of the ordinary. The officer asked Sheena's mother if she wanted to force open the door herself, but she decided not to. The officer left.

¶ 17       Sheena's sister later returned, and both she and her mother decided to enter Sheena's home through a window in the bedroom. They obtained a stepladder, took the screen off the window, and created a small opening. Because the two of them were too big to climb through, they pushed Sheena's three-year-old niece into the house. As soon as the niece entered, she started

to scream. Sheena's mother and sister instructed Sheena's niece how to open the front door, which she did by turning the deadbolt and the doorknob locks. Sheena's mother entered the home, discovered her daughter lying on the floor in her bedroom with blood coming from her neck, and went to her body. The police were called.

¶ 18        That same morning, around 8:30 a.m., defendant woke up, went for breakfast, visited a gas station to purchase a lottery ticket, and then went to a grocery store to purchase a bottle of liquor. After picking up a bottle of liquor, defendant rode a bus to the bus terminal, where he caught another bus with his brother, whom he met at the bus terminal. Defendant stated, on two occasions that morning, he spoke with Sheena by cell phone. The first conversation occurred around 9 a.m. and involved defendant asking whether the police were looking for him because of the iPad. The second conversation occurred while he was on the bus with his brother. He used his brother's cell phone to contact Sheena. Defendant stated the call involved him indicating he was going to return the iPad. Defendant also stated the call ended on a "good note."

¶ 19        Video recordings showed, at 10:19 a.m., defendant and his brother entered a bus at the bus terminal. At 10:22 a.m., defendant's brother handed defendant a cell phone. Defendant used the cell phone to send a text message and make a call to the Sheena's cell phone. Immediately before the phone call ended, the video shows defendant taking something out of his pocket. After ending the phone call, a small switchblade appeared in defendant's hand. Defendant opened the switchblade and then quickly brought the blade to his neck. At 10:27 a.m., defendant exited the bus within blocks of Sheena's home and began walking north in the direction of her home.

¶ 20        Defendant stated he exited the bus to buy "weed," not to go to Sheena's home.

Defendant changed his mind, however, because he wanted to obtain a union job and knew he would be tested for drugs. Defendant indicated he then went approximately two blocks south or southwest and saw his friend and his friend's mother in a vehicle. Defendant obtained a ride to his friend's place of employment.

¶ 21　　　Linda Reynolds gave defendant a ride the morning Sheena was murdered. That morning, Reynolds was running errands in town. After buying something at Home Depot, she went to pick up her son. Reynolds said she picked up her son at a location that was approximately four minutes away from Home Depot. A Home Depot receipt showed, at 10:45 a.m., she made a purchase. Reynolds also indicated her son called her prior to picking him up. At 11:14 a.m. and 11:20 a.m., Reynolds received calls from her son's phone. After picking up her son, she saw defendant. Defendant appeared sweating and out of breath and smelled of alcohol. It was hot outside, and defendant indicated he had been running. Defendant did not otherwise seem unusual, and no blood was seen on him. Reynolds dropped defendant off at her son's place of employment.

¶ 22　　　Defendant stated he later rode a bus to the apartment where he was staying. The police were unable to obtain bus videos from this trip. After arriving at the apartment, defendant stated he spoke with his roommate and then went to the grocery store to buy steaks and potatoes. Upon returning, defendant cooked and ate his food and then changed and washed his clothes. Defendant did not dry his clothes because he did not have enough money. Defendant's roommate indicated defendant returned home, did some laundry, went to the grocery store, and then returned and ate two steaks. He did not see blood on defendant. At 3:30 p.m., defendant voluntarily went to the police station and participated in an interview.

¶ 23        Sheena was discovered lying on her back in her bedroom, with one of her shoes knocked off. An undisturbed line of blood went across her neck and pooled under her body. No blood was found on her face, hands, upper chest, right arm, or lower body. Blood may have been on her left forearm, and a bloody footprint may have been near the pool of blood. Sheena's blood was found on her mother's shoes.

¶ 24        Autopsy results indicated Sheena had abrasions on both the middle and right side of her forehead and irregular bruising along her neck. She also had hemorrhages to her frenula, the tissue connecting her lips to her teeth, and to her conjunctiva, the tissue underneath the eyelid, both of which were caused by lack of oxygen to the head. Her hyoid bone, the bone at the top of the windpipe, was fractured, which was likely caused by manual strangulation. She had two stab wounds to her neck, caused by a sharp-edged weapon at least one inch long. She had no obvious trauma to her hands or defensive wounds. No deoxyribonucleic acid (DNA) was found under her fingernails. A forensic pathologist concluded the cause of death was multiple stab wounds to the neck with manual strangulation as a significant contributing condition. The pathologist could not determine which occurred first: the stabbing or the strangulation.

¶ 25        The door locks of Sheena's home were functional. Except for the window in the victim's bedroom, all the windows were secure. No evidence of a disturbance or forced entry existed. Setting aside the wounds to Sheena, no significant signs of a struggle existed. Her cell phone was discovered disassembled and in the toilet. Her house and car keys were found in the living room. Her vehicle was locked. No money in excess of $20 was found in her vehicle or her home.

¶ 26    The police obtained the clothing, backpack, and shoes defendant wore in the bus videos. The clothing had been washed, and no DNA was discovered on either the clothes or the shoes. The backpack contained job applications. No DNA from either Sheena or defendant was found in Reynolds's vehicle. Defendant's key to Sheena's home and his knife were never discovered.

¶ 27    At the end of its case in chief, the State published to the jury portions of defendant's video-recorded interview conducted at the police station. In the video, an exchange occurred between the detective and defendant regarding a report from April 2013, where Sheena alleged defendant had stolen $900 from her. Defendant explained the situation and indicated Sheena, approximately four or five days after he moved out of her home, called him and told him she did not want the money, and then they got back together. With respect to the iPad, defendant stated during the call with Sheena on the morning she was murdered he told her he was going to return the iPad, despite the fact he had already sold it. Defendant also acknowledged he was supposed to be going to her house that morning and indicated he was going there because he did not want Sheena to call the police again.

¶ 28    In its closing argument, the State argued defendant was the only person who had a key to the home and could have committed the murder and then locked the doors from the outside. The State noted the off-and-on relationship between Sheena and defendant, with the last period of separation occurring the week before Sheena's death. It also noted "the other thing we get to see on the bus video is that while [defendant] is talking to [Sheena] on the phone, he takes out of his pocket a folding knife and begins to play with it *** and to point it at his throat." After putting the

knife, a knife that was never found, to his throat, defendant exits the bus and walks in the direction of Sheena's home. The State asserted defendant provided no real explanation of what he did for the 50 minutes he was in the area of Sheena's home.

¶ 29     The State noted defendant stole the iPad when he moved out and "[t]here was some discussion about him taking some money from her before ***." The State suggested, after being contacted by the police about the stolen iPad, defendant may have gone over to her home to "smooth it over" with her and have her call the police to retract her complaint. The State also suggested, noting defendant's unemployment, he may have gone over to Sheena's home because he was angry she was no longer supporting him.

¶ 30     After arriving at the home, the State argued, a disagreement occurred between defendant and Sheena either about the iPad, the police, where Sheena was at 2 a.m., or whether she would still support him financially. The State argued defendant obtained possession of her phone to figure out where she was the night before and saw the text messages to her landlord about the $400 rent money, which the State noted was never found. Defendant then disabled the phone, struck her on the head, strangled her, and then stabbed her twice once she was on the ground. The State contended the blood on her body was undisturbed and no blood was found on defendant's clothes because the stabbing occurred after Sheena was disabled.

¶ 31     The State also highlighted defendant's demeanor in the police interview after he learned the woman he lived with for over a year, and whom he claimed to love, was murdered. The State noted he was seen laughing, joking, slouching, and did not seem upset. The State maintained the circumstantial evidence proved defendant's guilt beyond a reasonable doubt.

¶ 32 The defense argued no direct evidence connected defendant to Sheena's death. No one saw defendant at the scene, no DNA or physical evidence placed defendant at the scene, and the testimony of defendant's roommate and Reynolds supported his innocence because neither saw any blood on him or noticed anything unusual about him. The defense maintained defendant was looking for work, which was supported by the job applications in his backpack, and noted he went to the police station voluntarily. The defense argued coincidences were not enough to prove defendant guilty beyond a reasonable doubt.

¶ 33 Following deliberations, the jury found defendant guilty of first-degree murder.

¶ 34 C. Posttrial Proceedings

¶ 35 In January 2015, defendant filed a motion for a new trial, arguing he was not proved guilty beyond a reasonable doubt and suffered unspecified due process and equal protection violations. After a hearing, the trial court denied defendant's motion, finding the evidence was sufficient to support the verdict. It did not address defendant's unspecified due process and equal protection claims.

¶ 36 That same month, the trial court held a sentencing hearing. Based on the evidence and arguments presented, the trial court sentenced defendant to 52 years' imprisonment.

¶ 37 In February 2015, defendant filed a motion to reconsider his sentence. After a hearing, the trial court denied defendant's motion.

¶ 38 D. Appeal from Conviction and Sentence

¶ 39 In March 2015, defendant appealed from his conviction and sentence. *People v. Smith*, 2017 IL App (4th) 150209-U. On appeal, defendant argued he was entitled to a new trial

because the trial court improperly allowed the jury to hear evidence of Sheena reporting him for a theft of $900 months prior to the charged offense. *Id.* ¶ 47. In the alternative, defendant asserted he was entitled to either a reduction in his sentence or a new sentencing hearing because (1) the court's findings at the sentencing hearing were unsupported by the evidence and based on its own subjective beliefs and (2) the sentence imposed was excessive. *Id.* After review, we rejected defendant's arguments and affirmed his conviction and sentence. *Id.* ¶ 70.

¶ 40                                    E. *Pro Se* Postconviction Petition

¶ 41            In July 2017, defendant filed a *pro se* postconviction petition, which the trial court later advanced to the second stage of postconviction proceedings. The court appointed counsel to represent defendant.

¶ 42                                    F. Amended Postconviction Petition

¶ 43            In January 2018, defendant's postconviction counsel filed an amended postconviction petition on defendant's behalf. In part, the petition alleged defendant's right to the assistance of counsel was violated when appellate counsel failed to raise a claim concerning the sufficiency of the evidence on appeal from his conviction and sentence. In support, the petition cited the fact trial counsel "preserved" the issue by raising it in the motion for a new trial and the fact only circumstantial evidence was presented at trial. The petition also alleged defendant's right to due process was violated when the State knowingly made false statements in its opening statement and closing argument suggesting defendant spoke with Sheena while on the bus. In support, the petition cited the testimony elicited during the preliminary hearing and the evidence introduced at trial.

- 12 -

¶ 44                                  G. Motion to Dismiss

¶ 45        In March 2018, the State filed a motion to dismiss defendant's amended postconviction petition. In part, the State argued (1) there was more than sufficient evidence from which the jury could find defendant guilty beyond a reasonable doubt and (2) neither the testimony at the preliminary hearing nor the evidence at trial precluded the State from asserting defendant was speaking with Sheena while on the bus.

¶ 46                                        H. Dismissal

¶ 47        In August 2018, the trial court entered a written order dismissing defendant's amended postconviction petition, finding it failed to make a substantial showing of a constitutional violation.

¶ 48        This appeal followed.

¶ 49                                        II. ANALYSIS

¶ 50        On appeal, defendant argues this court should reverse the trial court's judgment because his amended postconviction petition made a substantial showing of a constitutional violation. Specifically, defendant contends he made a substantial showing of a violation of his right to (1) the assistance of counsel based on his appellate counsel's failure to raise a claim concerning the sufficiency of the evidence on appeal from his conviction and sentence and (2) due process based on the State knowingly making false statements in its opening statement and closing argument suggesting he spoke with Sheena and set up a meeting while on the bus.

¶ 51        As an initial matter, the State makes several arguments suggesting defendant has forfeited his claims for review. While the State's arguments are well taken, we elect to exercise

our discretion to consider the merits of defendant's claims. See *People v. Curry*, 2018 IL App (1st) 152616, ¶ 36, 100 N.E.3d 482 ("[F]orfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review an otherwise forfeited issue.").

¶ 52        At the second stage of postconviction proceedings, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Johnson*, 2018 IL 122227, ¶ 15, 123 N.E.3d 1083. The defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. We review a trial court's second-stage dismissal *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29, 124 N.E.3d 908.

¶ 53        Defendant contends he made a substantial showing of a violation of his right to the assistance of counsel based on his appellate counsel's failure to raise a claim concerning the sufficiency of the evidence on appeal from his conviction and sentence. We disagree. Defendant failed to make a substantial showing of a reasonable probability that, but for appellate counsel's failure to raise the claim, the result of the proceeding would have been different. See *Domagala*, 2013 IL 113688, ¶ 36 (discussing the standard to establish prejudice for a claim of ineffective assistance). This is because the evidence of defendant's guilt is overwhelming. The evidence established defendant was near Sheena's home soon before and soon after the murder. Bus surveillance video depicted defendant placing a knife to his throat immediately after he texted and called Sheena's cell phone and then exit the bus and walk in the direction of Sheena's home. Defendant was the only person, except for Sheena and the landlord, with a key to the home. There were no signs of forced entry, and the doors to the home were locked. Forensic pathology

established Sheena had stab wounds to her neck. Neither defendant's key to Sheena's home nor his knife were recovered. Although circumstantial, the evidence of guilt was overwhelming. See *People v. Hall*, 194 Ill. 2d 305, 330, 743 N.E.2d 521, 536 (2000) ("Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged.").

¶ 54 Defendant also contends he made a substantial showing of a violation of his right to due process based on the State knowingly making false statements in its opening statement and closing argument suggesting he spoke with Sheena and set up a meeting while on the bus. We disagree. The evidence admitted at trial showed defendant admitted to having a conversation with Sheena while he was on the bus with his brother. Defendant stated the call involved him indicating he was going to return the iPad. Defendant also stated the call ended on a "good note." Based on this evidence, it was entirely permissible for the State to make statements in its opening statement and closing argument suggesting defendant spoke with Sheena and set up a meeting while on the bus. The testimony at the preliminary hearing of the detective's impression and interpretation of the evidence he had viewed at that time did not limit the parameters of the State's opening statement and closing argument.

¶ 55 Because defendant has failed to show his amended postconviction petition made a substantial showing of a constitutional violation, we affirm the trial court's judgment dismissing the petition at the second stage of postconviction proceedings.

¶ 56 III. CONCLUSION

¶ 57 We affirm the trial court's judgment.

¶ 58          Affirmed.