**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190662-U

Order filed June 22, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0662 Circuit No. 19-CF-100 |
| MAURICE M. IRBY, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding |

_____

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Daugherity and Lytton concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The trial court did not err when it denied defendant's motion to dismiss on speedy trial grounds. Evidence was sufficient to sustain defendant's convictions. Defendant knowingly and voluntarily waived his right to counsel. The trial court did not err in denying defendant's motion for a new trial based on ineffective assistance of counsel and insufficiency of the evidence.

¶ 2     Defendant was convicted by a jury of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2018)) and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)). The

trial court sentenced defendant to consecutive terms of imprisonment of 23 years and 12 years, respectively. He appealed both his convictions and his sentence. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4         Defendant Maurice M. Irby was arrested on February 19, 2019, and charged by information with aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2018)) and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)). At a bond hearing, he was advised he could be sentenced to 6 to 30 years' imprisonment or 30 to 60 years' imprisonment if the sentence was extendable and possible fines of $25,000. Defendant asked for and was provided a public defender. Defendant was charged with the same offenses by indictment on March 5, 2019. The indictment alleged that on or about February 19, 2019, defendant possessed a handgun and committed a battery by shooting Dontirrys Alexander and had previously been convicted of unlawful possession of a weapon. Arraignment took place on March 7, 2019, at which the court admonished defendant that he could receive a sentence of 6 to 30 years for aggravated battery with a possible maximum sentence of 60 years if defendant was extended-term eligible and a sentence of 3 to 7 years with a maximum of 14 years for unlawful possession of a weapon by a felon if the extended term applied. A trial date of May 6, 2019, was set.

¶ 5         On April 10, 2019, defendant moved to proceed *pro se*. A hearing took place on defendant's motion. The trial court extensively explained to defendant the risks of proceeding *pro se*, which defendant acknowledged he understood. The court provided Illinois Supreme Court Rule 401(a) (Ill. S. Ct. R. 401(a) (eff. July 1, 1984)) admonishments and informed defendant that the sentencing range for aggravated battery was 6 to 30 years' imprisonment, 3 years' mandatory supervised release (MSR) and up to a $25,000 fine and that the sentencing range for unlawful possession of a weapon by a felon was 3 to 14 years' imprisonment with a 2-year MSR term and

a possible $25,000 fine. After questioning defendant, the trial court found he knowingly and voluntarily waived his right to counsel. Defendant filed a motion for discovery the same day and the State indicated it would have to review the discovery to redact portions to which defendant was not entitled. Defendant's now-discharged attorney stated that defendant's discovery motion was "a little more specific than some." The May 6, 2019, jury trial date was vacated by the court, which set a hearing for May 15, 2019, on defendant's discovery request. The court attributed the delay to defendant due to his late *pro se* request and defendant agreed.

¶ 6        At the May 15, 2019, hearing on defendant's discovery motion, the State tendered an "initial discovery packet" to defendant but informed defendant it was awaiting the results of the firearm examination. The State was also compiling videos of witness interviews and from law enforcement body cameras to submit to defendant. Defendant inquired regarding the timetable to obtain the requested items, stating that he could not move forward with his motions without the materials. The court addressed defendant's discovery motion point by point and noted there was "lots of legwork to do." It ordered the parties to return in three to four weeks to assess whether further discovery had been fully tendered to defendant. Defendant responded that he understood the reason for the delay. He inquired whether his speedy trial term would "start back up after today" and stated he wanted the speedy trial clock to run. The trial court determined that the clock would begin when a trial date was set after discovery was completed. The court then scheduled June 13, 2019, for discovery review and June 24, 2019, for trial. The order entered provided the case was continued on defendant's discovery motion.

¶ 7        On June 13, 2019, the State informed the court that it had tendered outstanding discovery to defendant and that discovery was now complete. Defendant requested two additional items, which the State provided. Both parties announced ready for trial. On the trial date of June 24, the

State moved to continue because it was not ready for trial. The trial court granted the continuance over defendant's objection. The court set a scheduling conference for July 1, 2019, and a trial date of July 8, 2019. The State sought another continuance on July 8, 2019, due to an unavailable witness. The court granted the continuance over defendant's objection and a new trial date was set for July 15, 2019. In a motion filed July 10, 2019, the defendant moved to dismiss on speedy trial grounds. The trial court denied the motion, finding the speedy trial clock did not resume on May 15 because defendant requested a continuance and the State was still seeking discovery per defendant's request.

¶ 8        A jury trial began on July 15, 2019. Justin Sinks, a sergeant with the Peoria Police Department, testified. As part of his investigation into defendant and Lionell Harris, he responded to the Circle K gas station on February 19, 2019. Three subjects were in a black Chevrolet Malibu in the station's lot and at least two of them were wanted on warrants. Danielle Devine was in the driver's seat; Harris was the front seat passenger and defendant was in the back seat behind Harris. When Sinks pulled up to the vehicle, defendant leaned quickly to his left and then back to the right. Harris dipped toward the floor. Fearful Harris was reaching for a weapon, Sinks hit the vehicle's hood, which startled Harris, who looked up and kept his hands visible. Defendant, Harris and Devine were arrested.

¶ 9        Sean Johnston, a Peoria police officer, testified that on February 19, 2019, he was surveilling a house. Harris, who was the subject of the surveillance, had an outstanding warrant. He observed Harris and a woman enter a black Chevrolet sedan and drive off. Johnston followed them to a car wash and last saw the vehicle as it turned to drive "into the city." Other unmarked vehicles continued the surveillance at that point. Johnston responded to the Circle K where the Chevrolet ended up. He described that the Chevrolet had heavily tinted windows which prevented

4

him from seeing inside. He did not observe any movement by the passengers. When he opened the back seat door on the driver's side, he saw a Glock handgun, with its handle up behind and against the driver's seat. Defendant was the back seat passenger.

¶ 10 Erin Barisch, a Peoria police officer, testified that he also conducted surveillance on Harris and was at the Circle K where he approached the vehicle's right rear passenger door. He could not see any movement by the passenger. Defendant was in the back seat and Barisch arrested him. When he removed defendant from the vehicle, he could see a firearm on the floorboard on the driver's side of the vehicle. Barisch also removed and arrested Harris from the front passenger seat. Another weapon was found directly underneath where Harris was sitting.

¶ 11 Portions of body camera videos from Sinks, Johnston and Barisch were played. They showed the officers converging on the vehicle at the Circle K and arresting defendant. They also showed a weapon on the floorboard behind the driver's seat.

¶ 12 William Bohm, a deputy with the Peoria County Sheriff's Office, testified. On February 19, 2019, he received information about a gray Mitsubishi SUV that was leaving Taft Homes after a shooting. He responded to the 500 block of Homestead Avenue, where he saw the SUV turn into an alleyway. There was only one individual in the vehicle, whom Bohm identified as defendant. The defendant exited the vehicle and began looking at his cell phone. Defendant made a phone call and acted as though he was waiting for someone to pick him up. He was picked up by someone driving a black Chevrolet. Bohm followed the Chevrolet until it turned into the Circle K gas station. A takedown occurred and defendant was removed from the back seat. Bohm returned to the location of the SUV, which had bullet strikes on the rear passenger side door. The passenger headrest also had a bullet strike through it. He also observed broken glass. On cross-examination, Bohm said he did not see defendant with a weapon.

¶ 13        Peoria Police Department Officer Scott Bowers testified that he responded to the Circle K on February 19, 2019. He photographed a Chevrolet Malibu and collected two weapons from inside it. One was a .40-caliber Glock discovered in the back seat. A .380-caliber Taurus was recovered under the front passenger seat. Bowers photographed the victim, Alexander, at St. Francis Hospital later the same day. Alexander had suffered a gunshot injury to his left leg. Bowers also went to the location of the SUV and photographed it. There was a bullet hole to the passenger headrest and a shell casing under broken glass on the front passenger seat. He identified the Glock. There were no fingerprints found on it.

¶ 14        Paul Tuttle, an officer with the Peoria Police Department, testified that he processed the Mitsubishi SUV on February 20, 2019. The rear door was defective. There was broken glass and a shell casing on the front passenger seat. The front passenger seat headrest had a hole through it. He could not pinpoint the angle of the bullet that entered the headrest. The driver's side of the vehicle was not damaged, the front windshield was not broken and there was no glass on the driver's seat. The area around the driver's seat was not damaged. He did not see any blood.

¶ 15        Peoria Police Department Officer Nicholas Russell testified. He was on duty on February 19, 2019. He observed the SUV in the alley in the 500 block of Homestead Avenue. The windows and rear door of the passenger side of the vehicle were damaged. His body camera recorded his observations. The body cam video was played for the jury. The video depicts Russell approaching the SUV and stating the SUV has been "completely shot to shit." Both passenger side windows were shot out. Another officer tells Russell, "100%, he's the one that got out of it. [Defendant]. Cuz right as I pulled in here, he pulled in and came right around here and got out." Another officer says, "How did he not get shot?" Russell says, "Right in here. If there would have been a passenger." He points out multiple locations on the passenger side door, stating it was "shot up."

6

The video depicts damage appearing to be bullet strikes to the outside of the rear passenger side door.

¶ 16    Jason List, a firearm identification expert at the Illinois State Police Morton Forensic Science Laboratory, testified. He examined the .40-caliber Glock found in the Chevrolet and the shell casing found in the Mitsubishi and determined that the shell casing had been fired from the Glock.

¶ 17    Dontirrys Alexander testified. He was shot in February 2019 when leaving a store located near Taft Homes. He was with his brother. He was going across the street toward Taft Homes with his back to the street when he heard shots coming from nearby. He was shot in the leg. He did not know he had been shot until someone told him. He did not know who shot him. He did not see who shot him. He did not see shots coming from the SUV. He went to the hospital after the shooting. On cross-examination, Alexander stated that he did not know what angle the bullet entered and/or exited his leg.

¶ 18    Peoria police officer Joseph Smiles testified that he responded to the shooting at Taft Homes. He photographed the scene. He observed window glass in the street at the intersection where Alexander was shot. He downloaded the video from Taft Homes security, It showed the area facing northbound on Adams Street towards Green Street with Taft Homes on the right side. He did not see a gun or muzzle flash in the video. He did not find any projectiles, spent shell casings, bullet holes or bullet strikes at the scene of the shooting.

¶ 19    The Taft Homes surveillance video was played for the jury. The camera overlooks a one-way street with traffic moving away from the camera. A residential area was located on the right side of the road. Two individuals began walking on the sidewalk on the right side away from the camera. When they reached the end of the block, an SUV appeared, driving in the far right lane

and headed in the same direction as the pedestrians. It slowed down and briefly stopped near the two pedestrians. Other individuals on the passenger side of the SUV started to run, the SUV sped away, and one of the running individuals fell, got up, and hobbled out of the camera's view.

¶ 20    The parties stipulated that on February 19, 2019, defendant had been previously convicted of a felony. The State rested. The defendant did not present evidence. Following deliberations, the jury found defendant guilty of both offenses.

¶ 21    Defendant filed a *pro se* motion for a new trial, arguing in part that his speedy trial rights were violated. Counsel filed an appearance for defendant and twice filed addendums to defendant's motion for a new trial. The second addendum alleged that Alexander was defendant's second cousin and referenced an affidavit from Alexander. In the affidavit, Alexander attested that he told the jury he did not know the name of the shooter; however, he did know his physical appearance. After the trial concluded, Alexander learned the shooter's name was Anthony Moseley, who lived in Chicago. He further attested defendant was not the shooter. Defendant was his second cousin. Finally, Alexander attested he was not pressured to submit the affidavit.

¶ 22    A hearing took place on defendant's motion for a new trial. Defense counsel stated that defendant and Alexander were second cousins but did not argue that Moseley was the shooter. Counsel did not call Alexander to testify, although he was in the courtroom. The trial court suggested it was not the appropriate time for defendant to argue on the merits of the affidavit because it was based on evidence outside the trial record. The trial court accepted the affidavit as a proffer. Defendant further argued that he was incompetent to represent himself at the trial and that the evidence was insufficient to convict him. The trial court rejected defendant's arguments, finding defendant was admonished regarding the risks of proceeding *pro se* and that the evidence was sufficient to convict. It denied defendant's motion for a new trial.

8

¶ 23    A sentencing hearing ensued. The court sentenced defendant to 23 years' imprisonment for aggravated battery and 12 years' imprisonment for unlawful possession of a weapon by a felon. The court determined that consecutive sentences were necessary to protect the public from any further criminal conduct of defendant. Defendant timely moved to reconsider, which motion the trial court denied. Defendant appealed.

¶ 24                                    II. ANALYSIS

¶ 25    Defendant presents four issues on appeal. First, he complains that his speedy trial rights were violated. Next, he argues the evidence was insufficient to sustain his conviction. Third, he submits that he did not knowingly waive his right to counsel. Finally, defendant argues that the trial court should have granted his motion for a new trial.

¶ 26                                   A. Speedy Trial

¶ 27    We begin with defendant's claim that his speedy trial rights were violated. Defendant argues that the trial court erred when it denied his motion to dismiss for a speedy trial violation and urges this court to reverse his conviction outright.

¶ 28    A defendant has both a constitutional and a statutory right to a speedy trial in Illinois. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103-5(a) (West 2018); *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). The statute provides, in part:

> "(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2018).

9

A defendant in custody who is not tried within 120 days "shall be discharged from custody." *Id.* § 103-5(d). Where delay is occasioned by the defendant, the speedy trial clock is temporarily suspended. *Id.* § 103-5(f). Speedy trial provisions are construed liberally in defendant's favor. *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 56.

¶ 29　　　　To prove a speedy trial violation, a defendant must show that he was not tried within the statutory period and he did not cause or contribute to the delays. *People v. Staten*, 159 Ill. 2d 419, 426 (1994). When deciding whether the defendant occasioned the delay, "the criterion is whether his acts in fact caused or contributed to the delay." *People v. Turner*, 128 Ill. 2d 540, 550 (1989). "A delay occasioned by the processing of the defendant's motions, including the time required for the State to respond and the time necessary for the court to hear and decide the issues, is attributable to the defendant." *People v. Kliner*, 185 Ill. 2d 81, 117 (1998). When a defendant's motion for discovery seeks items that are not quickly available or requires detailed answers, the delay is attributed to the defendant. *People v. Scott*, 13 Ill. App. 3d 620, 630 (1973). The trial court's determination regarding who is responsible for a speedy trial delay is reviewed for an abuse of discretion. *Janusz*, 2020 IL App (2d) 190017, ¶ 56. The ultimate question of whether the defendant's statutory rights to a speedy trial were violated is reviewed *de novo. Id.*

¶ 30　　　　We find that the trial court did not err when it denied defendant's motion to dismiss for a speedy trial violation. Defendant was arrested on February 19, 2019. He was arraigned on March 7, and a May 6 trial date was set. On April 25, 2019, the trial court accepted defendant's waiver of his right to counsel and defendant filed a discovery motion, which he asserted was "essential and material" to the preparation of his defense. Former counsel characterized defendant's motion for discovery as "a little more specific than some" and noted that the defense was aware that some of the requested DVDs were not yet in the possession of the State. The trial court suggested and

defendant agreed that the State could tender discovery at a status hearing, which was then scheduled for May 15. The trial court vacated the trial date and attributed the delay to defendant due to his late request to proceed *pro se*, to which defendant agreed.

¶ 31     At the May 15, 2019, hearing, the State tendered an "initial discovery packet" and informed the court that other discovery was still outstanding. The trial court went through defendant's motion for discovery request by request. Some of the information defendant sought was not yet in the State's possession, including several body cam DVDs and firearm examination reports. Defendant inquired about the timetable for obtaining the materials, stating, "I can't move forward as far as motions without that." Based on the State's estimate of the time necessary to satisfy defendant's discovery request and the court's observation that defendant's motion for discovery was "pretty involved" and there remained a "lot of legwork" to be done, the court suggested the parties return in three to four weeks to check the status of discovery. Defendant asked whether the speedy trial clock would begin to run and was informed by the court that the clock was tolled until defendant's motion was concluded. The trial court set June 13, 2019, as a status date and June 24, 2019, for trial.

¶ 32     We find that the period of delay between May 15 and June 13 is attributed to defendant. Although the court ruled on the propriety of defendant's discovery requests on May 15, 2019, some of his discovery requests were still pending as the State had not yet provided all the materials. The State was still awaiting possession of several items defendant sought and estimated the materials would not be received for at least two weeks. According to defendant, he could not proceed on any further motions without the requested discovery materials. The order issued May 15, 2019, provided that the matter was continued on defendant's motion for discovery review. Accordingly, because the delay was occasioned by the processing of defendant's discovery

11

requests, the delay until June 13 was attributed to defendant. Defendant's discovery requests were resolved on June 13 and both parties announced they were ready for trial.

¶ 33        Discovery was complete on June 16, 2019, and the speedy trial clock began to run. The State was not ready for trial on June 24, 2019, and the trial setting was continued over defendant's objection until July 15, 2019. On that date, defendant's speedy trial clock was at day 97. Because defendant was tried within the statutory 120-day period, there was no speedy trial violation. We find the trial court did not err in denying defendant's motion to dismiss based on violation of his speedy trial rights.

¶ 34                                 B. Sufficiency of the Evidence

¶ 35        We next address the sufficiency of the evidence. Defendant maintains that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery. He argues that the State did not prove he caused injury to Alexander, which is an essential element of the offense. When considering a challenge to the sufficiency of the evidence, the question is whether the evidence, viewed in a light most favorable to the State, is such that a rational trier of act could have found the essential elements of the offense proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 36        "A person commits aggravated battery when, in committing a battery, he or she knowingly *** discharges a firearm *** and causes any injury to another person." 720 ILCS 5/12-3.05(e)(1) (West 2018). A person commits battery when he "knowingly without legal justification by any means (1) causes bodily harm to an individual." 720 ILCS 5/12-3(a) (West 2018). A conviction may be sustained solely on circumstantial evidence. *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007) (citing *People v. Patterson*, 217 Ill. 2d 407, 435 (2005)). Circumstantial evidence is proof of facts or circumstances giving rise to reasonable inferences of other facts tending to establish

12

defendant's guilt or innocence. *Id.* The factfinder does not need to be convinced beyond a reasonable doubt of each link in the chain but the evidence, taken together, must prove the defendant's guilt beyond a reasonable doubt. *People v. Milka*, 211 Ill. 2d 150, 178 (2004) (citing *People v. Hall*, 194 Ill. 2d 305, 330 (2000)).

¶ 37        The State presented circumstantial evidence which satisfied its burden to prove defendant guilty of all the elements of aggravated battery beyond a reasonable doubt. The State presented the following facts. Alexander was shot as he walked down the street with his brother near Taft Homes around 2 p.m. The police were informed a gray SUV left the area of the shooting. Police located the SUV and saw defendant exit it. He was the lone person in the vehicle. The SUV had broken glass on the front passenger seat, its passenger side windows were shot out, and the passenger side sustained bullet strikes. A bullet passed through the front seat passenger's headrest. A spent shell casing was found on the front passenger seat. Glass fragments were found at the intersection where the SUV stopped.

¶ 38        Defendant was picked up by individuals in a black Chevrolet sedan, which was followed to the gas station where officers descended on the vehicle. A Glock was found on the floor behind the driver's seat in the Chevrolet, next to where defendant was seated in the back seat on the passenger's side. The firearms expert testified the shell casing found in the SUV was discharged from the Glock. Video surveillance from Taft Homes showed an SUV stop near two individuals walking down the street and then other persons in the area begin to run away from the SUV; one person fell, got up and hobbled away. This evidence establishes sufficient links in the chain of evidence, which taken together, prove beyond a reasonable doubt that defendant shot and injured Alexander.

13

¶ 39    Defendant presents additional arguments he claims defeat the sufficiency of the State's evidence. First, he submits the State lacked evidence that a bullet from the Glock recovered from the back seat of the Chevrolet hit Alexander. The fact that no bullet was recovered from Alexander's injury does not negate that the Glock was the gun used to shoot Alexander. As discussed above, the Glock was found within reaching distance of defendant in the Chevrolet. The shell casing found in the SUV which defendant was driving after the shooting matched the Glock. His argument is unpersuasive. Defendant also suggests that someone outside the SUV shot Alexander. While Alexander testified he heard multiple gunshots and the SUV had missing windows and a couple of bullet strikes in its passenger side, the surveillance video from Taft Homes only shows individuals fleeing from and no one running toward or shooting at the SUV. There were no bullets or casings found at the scene. These facts lessen the possibly that a shootout from outside the SUV caused Alexander's injury. Finally, defendant submits that the SUV was unmonitored for a period of time after the shooting and before law enforcement located the vehicle, allowing the possibility that the real shooter exited the vehicle prior to defendant parking it in the alley. However, per the officers' comments and body cam videos, had a passenger been present in either the front or back seat, he or she likely would have suffered a gunshot wound. There was no blood found in the SUV.

¶ 40    Defendant relies on *People v. Lavelle*, 396 Ill. App. 3d 372 (2009), as support for his claim that the State did not prove he discharged the weapon that injured Alexander. *LaValle* is distinguished in that there were two possible shooters and no ballistic evidence connecting the bullet with either of the shooters' guns. *Id.* at 384. Here, there is no admitted second shooter. In addition, as discussed above, the Taft Homes video shows the crowd running from the SUV, not

14

dispersing from itself as would have occurred had there been a shooter in the crowd. *Lavelle* does not aid defendant.

¶ 41                                      C. Waiver of Right to Counsel

¶ 42        The third issue for our review is whether defendant knowingly and voluntarily waived his right to counsel. Defendant maintains that he did not knowingly waive his right to counsel where the trial court did not substantially comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). He specifically and correctly argues that he was not admonished that the trial court could impose consecutive sentences. According to defendant, because he was not informed of the maximum possible term of imprisonment based on consecutive sentences, his waiver of counsel was not knowing and voluntary.

¶ 43        Defendant failed to preserve this issue but argues plain error review is appropriate. Under the plain error doctrine, a court may consider an unpreserved error when (1) the evidence is closely balanced such that the error threatened to tip the scales against the defendant or (2) the error is so serious it affects the integrity of the justice system. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). We may review the lack of substantial compliance with Rule 401(a) under the second prong of the plain error doctrine because the right to counsel is fundamental. *People v. Vazquez*, 2011 IL App (2d) 091155, ¶ 14.

¶ 44        Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) provides that before a trial court may accept a waiver of counsel, it must admonish defendant in open court and ensure his understanding of the following:

              "(1) the nature of the charge;

15

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." *Id.*

The purpose of Rule 401(a) is " 'to ensure that a waiver of counsel is knowingly and intelligently made.' " *People v. Campbell*, 224 Ill. 2d 80, 84 (2006) (quoting *People v. Haynes*, 174 Ill. 2d 204, 241 (1996)). A trial court must substantially comply with Rule 401(a) for a waiver of counsel to be effective. *Id.* Substantial compliance supports a valid waiver where the record demonstrates the waiver was knowingly and voluntarily made and the admonishment provided to the defendant did not prejudice his rights. *People v. Nemec*, 2019 IL App (2d) 170382, ¶ 18 (citing *People v. Wright*, 2017 IL 119561, ¶ 41).

¶ 45　　At the hearing on defendant's motion to proceed *pro se*, the court informed defendant regarding the nature of the charges and that he had a right to counsel. It further informed him that the possible term of imprisonment for aggravated battery was 6 to 30 years and 3 to 14 years for unlawful possession of a weapon by a felon. The court committed two errors. First, the trial court provided an incorrect minimum sentence for unlawful possession of a weapon by a felon. The sentencing range defendant was subject to for that offense was 7 to 14 years because of defendant's qualifying prior convictions. See 730 ILCS 5/5-4.5-110(c)(1) (West 2018). The court also failed to inform defendant that it could impose consecutive sentences. See 730 ILCS 5/5-8-4(c) (West 2018). Rather than the 30-year maximum term about which the trial court admonished him, the trial court imposed a total sentence of 35 years; 23 years for aggravated battery and 12 years for unlawful possession of a weapon by a felon with the terms to be served consecutively.

¶ 46    Nevertheless, we find the court substantially complied with the Rule 401 requirements despite the errors. Defendant stated that he wanted to self-represent because he was facing significant time in prison. He explained to the court: "Because I'm facing a lot of time, I rather my life be in my own hands." Prior to defendant's submission of his motion to proceed *pro se*, the trial court had incorrectly informed defendant that it could impose a sentence of up to 60 years if defendant was eligible for an extended term. Knowing that he was facing a significant term of imprisonment, defendant still insisted on representing himself. See *People v. Reese*, 2017 IL 120011, ¶¶ 64-65 (waiver of counsel effective where court advised defendant he was facing "massive time" but did not inform defendant of the possibility the sentences could run consecutively). Defendant has not argued that he would not have proceeded *pro se* had he known he faced additional time if consecutive sentences were imposed. See *Wright*, 2017 IL 119561, ¶¶ 55-57 (trial court substantially complied with Rule 401 although it did not admonish regarding the maximum sentence where defendant did not allege he would not have represented himself had the admonishments been correct). To the contrary, his stated reason to proceed *pro se* was due to the fact he was "facing a lot of time." We conclude that the trial court's failure to inform defendant that he could serve an additional five years if consecutive sentences were imposed would not have altered his decision to represent himself. Based on defendant's reasoning, the possibility that his sentence could be longer would have strengthened his resolve to represent himself. We find the trial court substantially complied with the Rule 401 requirements and that defendant's waiver of counsel was knowing and voluntary.

¶ 47                                D. Motion for a New Trial

¶ 48    The final issue is whether the trial court should have granted defendant's motion for a new trial. Defendant argues that he was entitled to a new trial on the basis of ineffective assistance of

17

posttrial counsel where counsel failed to argue newly discovered evidence establishing his innocence. Specifically, defendant asserts that counsel should have argued that an affidavit submitted by the victim, Alexander, warranted an evidentiary hearing and that counsel should have called Alexander, who was in the courtroom, to testify regarding the claims in his affidavit.

¶ 49 To prevail on a claim of ineffective assistance of counsel, defendant must establish that his counsel's performance was deficient and that the deficient performance prejudiced him, such that but for counsel's errors, the results of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). There is a strong presumption that counsel's performance was reasonable; generally, matters of trial strategy are not amenable to an ineffective assistance of counsel claim. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 223. Claims of ineffective assistance of counsel present a mixed question of law and fact. *Id.* ¶ 222. Factual findings that bear on the issue of whether counsel was ineffective will not be reversed unless they are against the manifest weight of the evidence. *Id.* The ultimate question of whether counsel was ineffective is reviewed *de novo*. *Id.*

¶ 50 "To warrant a new trial based on newly discovered evidence, the evidence (1) must have been discovered since the trial, (2) must be of such a character that it could not have been discovered prior to trial with the exercise of due diligence, (3) must be material to the issue and not merely cumulative; and (4) must be of such a conclusive character that it will likely change the result on retrial." *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 94. This court will not disturb the trial court's ruling on a motion for a new trial absent an abuse of discretion. *Hulbert v. York*, 319 Ill. App. 3d 54, 60 (2001).

¶ 51 Defendant submits that Alexander's affidavit constitutes newly discovered evidence. He is incorrect. The information defendant wants to present does not qualify as newly discovered

18

evidence. In his affidavit, Alexander avers that someone other than the defendant shot him, that he did not previously know the shooter's name, only a physical description, and that he only learned of the shooter's name posttrial. He further averred that defendant was his second cousin. However, the fact that someone other than defendant shot Alexander would have been known to Alexander prior to trial even if the alleged shooter's name was unknown. Alexander made no mention of another shooter when he testified. The fact that he discovered the supposed shooter after trial indicates the shooter's identity could have been discovered before trial with the exercise of due diligence. The evidence that Alexander did see who shot him would not be cumulative to the evidence presented at trial where Alexander testified he did not see the shooter. Because Alexander testified at trial that he did not know who shot him, his new statement would not likely change the result on retrial as there would be two conflicting versions of Alexander's account. Moreover, because he testified differently at trial, Alexander's new statement would be in the nature of impeachment, which does not constitute new evidence. See *People v. Smith*, 177 Ill. 2d 53, 86 (1997) ("newly discovered evidence offered to impeach a prosecution witness is an insufficient basis for granting a new trial").

¶ 52    Based on these facts, the trial court would not have reached a different conclusion had Alexander testified or if defendant had argued the affidavit was newly discovered evidence. Even posttrial counsel had called Alexander as a witness and presented argument, the trial court would not have granted defendant's motion for a new trial based on newly discovered evidence because defendant did not offer any newly discovered evidence. Alexander was in the courtroom and posttrial counsel informed the court that he could establish other facts not presented at trial. The trial court indicated that defendant's claims were better suited to a collateral proceeding because they raise issues outside the record. See *People v. Veach*, 2017 IL 120649, ¶ 46 (claims alleging

ineffective assistance of counsel may be better suited to collateral proceedings when "the record is complete or inadequate for resolving the claim"). The trial court was correct. Posttrial counsel did not perform deficiently and defendant was not prejudiced by counsel's performance. We find the motion for a new trial was properly denied.

¶ 53                                  III. CONCLUSION

¶ 54          For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed.

¶ 55          Affirmed.